Peter W. SCHELLENBACH, Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 92–1254.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1992.

Decided March 17, 1993.

Marvin Green (argued), Anne Jentry–Green, Chicago, IL, for petitioner.

Jacob H. Stillman, Lucinda Burwell (argued), Judith R. Starr, S.E.C., Office of the General Counsel, Washington, DC, for respondent.

Before CUMMINGS, POSNER, and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

Peter W. Schellenbach does not dispute a finding of the Securities and Exchange Commission that he wrote bad checks and falsified reports to create the illusion that his Chicago securities firm, Brook Investments, Inc. ("Brook"), was solvent. However, Schellenbach contends that his punishment—including a $50,000 fine, censure, and lifetime ban on his acting in any principal, supervisory or managerial capacity with any member-firm of the National Association of Securities Dealers ("NASD")—is too severe. He also suggests that he wouldn't have been prosecuted in the first instance but for a plot among "rogue" NASD staff members who sought to make themselves look good at his expense. Under petitioner's theory, the NASD reneged on a promise not to prosecute his violations of the securities laws only after staff members learned that the FBI was interested in the case. Schellenbach's punishment must be affirmed, however, because he has no proof of any such conspiracy, and because, even if he did have proof, the intent of NASD staff members is irrelevant; the SEC, not the NASD, imposed the sanctions petitioner appeals.

This Court has jurisdiction to hear appeals of final SEC orders under Section 25(a)(1) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78y(a)(1). Because the SEC lacks the resources to police the entire securities industry, it relies on participants in the markets to govern themselves. NASD is a registered association of securities broker-dealers that is charged under the Exchange Act with "provid[ing] a fair procedure for the disciplining of members and persons associated with members * * *." Exchange Act § 15A(b)(8), 15 U.S.C. § 78o–3(b)(8). Under NASD procedures, an NASD Regional District Business Conduct Committee ("District Committee") conducts hearings, makes findings and imposes penalties against members who break rules. *Mister Discount Stockbrokers, Inc. v. SEC*, 768 F.2d 875, 876 (7th Cir.1985). These judgments are reviewed by the NASD Board of Governors, and then by the SEC itself under Section 19(d)(2) of the Exchange Act, 15 U.S.C. § 78s(d)(2). Since the Commission reviews NASD penalties from scratch—conducting an independent review of facts and law—this Court will "consider errors in [NASD] proceedings 'only if and to the extent that they infected the Commission's action by leading to error on its part.' " *Shultz v. SEC*, 614 F.2d 561, 568 (7th Cir.1980) (quoting *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir.1952), certiorari denied, 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664). The Commission's findings of facts are conclusive if supported by substantial evidence, 15 U.S.C. § 78y(a)(4), and this Court will reverse the Commission's imposition of sanctions only if the SEC abused its discretion. *Mister Discount*, 768 F.2d at 879.

Petitioner Schellenbach, now an employee with the Merrill Lynch securities firm, was president, majority shareholder and financial and operations principal of Brook, a former member of NASD. According to SEC findings which Schellenbach does not dispute in this appeal, Brook's finances began to falter in early 1986. By July of that year the firm's net capital had fallen below the required minimum for the second time in six months. Schellenbach started writ-

ing checks to Brook from his personal account, supposedly to purchase receivables. The purchases were listed on Brook's financial statements as cash. It was a scam; the receivables were worth nothing or much less than Schellenbach had paid for them, and Schellenbach did not have the money in his account to cover the checks. The bank did not dishonor the checks because Schellenbach sold the receivables back to Brook after a few days for roughly the same amount that he had bought them. This system allowed petitioner to mislead investors and regulators and foster the illusion that Brook was financially sound.

Schellenbach also tried to deceive regulators between February and November 1986 by not recording on Brook's accounting ledger routine operating expenses and amounts due Brook's clearing firm. And Schellenbach both failed to file and filed inaccurate reports with the NASD because he knew that NASD officials would order him to shut down Brook if they learned about the firm's capital deficiencies. The scheme collapsed in November 1986 when an infusion of outside capital that Schellenbach had hoped for failed to materialize, and the firm closed its doors. Brook was booted out of the NASD in October 1987 for failing to pay its fees to the association. Schellenbach maintains that no Brook customer lost money because of his activities. Not all parties were pleased, however. According to the testimony of Schellenbach and his lawyer before the District Committee, twenty-three people lost their investments in the firm (including Schellenbach who claims to have lost $200,000). Petitioner charges that three of these "owner-investors undertook to drive [him] out of the securities business if he did not make good their lost investments" (petitioner's brief at 4). These three, according to Schellenbach, vented their rage against him by lodging complaints with the IRS, FBI, SEC, NASD, and the attorney general and secretary of state of Illinois.

When Schellenbach ended his affiliation with Brook, the NASD undertook a "termination investigation" as required by Article IV, Section 3(a) of the NASD Manual and By-laws (respondent's app. at 2–A). On March 11, 1988, Eugenia T. Sampat, an NASD supervisor, sent a letter to Brook signaling the end of this investigation ("Sampat letter"). The letter said in part:

At its recent meeting, the District Business Conduct Committee reviewed the report of this investigation and determined that no action was warranted regarding the activities of the Registered Representative or your firm in connection with this termination. In this regard, the termination has been processed and the temporary "hold" placed on the registration during the investigation has been removed.

(Petitioner's app. at 26). This letter did not end Schellenbach's legal troubles. In the summer of 1988, presumably because of prompting by the disgruntled investors, the FBI began an investigation of Brook, though criminal charges were never filed. Some time later Schellenbach learned that he was also under investigation by the NASD. Petitioner and NASD officials discussed a settlement, but they could not agree and both parties now dispute which side made the overture. In any event, the NASD responded to the failed negotiations by beginning formal disciplinary proceedings against Schellenbach with the filing of a five-count complaint. The District Committee, NASD's front-line investigative and disciplinary panel, found that Schellenbach had violated the NASD Rules of Fair Practice under Article III, Section 1 ("A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade") and Article III, Section 18 ("No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance") (respondent's app. at 3–A). The NASD Board of Governors affirmed the findings of the District Committee after an independent review; the Committee censured Schellenbach, fined him $50,000, barred him for life from acting as a principal in NASD-member activities, and barred him from non-principal activity for sixty days (see petitioner's app. at 16–24). Petitioner

appealed to the SEC, which also conducted an independent review. On December 4, 1991, the Commission affirmed the sanctions imposed by the NASD. It is this ruling that petitioner now appeals.

■ Schellenbach makes a series of arguments why he should not have been prosecuted by the NASD. He first contends that the NASD was bound by the District Committee's seeming exoneration of him in the Sampat letter. Yet petitioner cites no cases to support the proposition that the NASD may not reopen an investigation or that its doing so subjects him to double jeopardy. His only authority is Section 19(e)(1)(A) of the Exchange Act, which requires that the SEC, in applying a sanction, must ensure that "such provisions are, and were applied in a manner, consistent with the purposes of this title." 15 U.S.C. § 78s(e)(1)(A). Schellenbach suggests that this language requires the SEC to "reconcile the District Business Conduct Committee's first exoneration decision with the same Committee's subsequent findings against Schellenbach * * * " (petitioner's brief at 14). Section 19(e)(1)(A), however, says only that sanctions must be applied "consistent with the purposes of this title;" it does not say that the NASD must be consistent if, indeed, reopening an investigation is an indication of inconsistency. Nor does the Constitution's double jeopardy clause apply to civil proceedings. *Breed v. Jones*, 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975). Thus even if the Sampat letter signaled that the NASD had closed its investigation of Schellenbach, the NASD was perfectly free to reconsider the matter absent some due process violation.

■ More to the point, the NASD did not reopen its investigation of Schellenbach because the investigation was never closed to begin with. The Sampat letter applied only to the "termination" of Schellenbach's affiliation with Brook under Article IV, Section 3(a) of the NASD Manual and By-laws; the letter made no representations about his admitted violations of securities law. It did not, for example, refer to petitioner's writing bad checks, filing of false docu-

ments with the NASD, or covering up the true state of Brook's net capital assets. Recall the qualifying language in the letter: "[N]o action was warranted regarding the activities of the Registered Representative or your firm in connection with this termination. *In this regard,* the termination has been processed * * * " (emphasis added) (petitioner's app. at 26). The Sampat letter was also addressed to Brook, not to Schellenbach as an individual.

■ Schellenbach next suggests that the NASD violated its rules because the settlement offer that he claims was initiated by the association came in a phone call from a staff member rather than from the District Committee itself. Section 10(a) of the NASD Code of Procedure provides that "the *Committee* may suggest that the member or associated person submit a letter containing an acceptance of a finding of violations * * * " (emphasis added) (respondent's app. at 8–A). We decline to read this reference to "Committee" in the NASD Code of Procedure to prohibit a staff member from making a telephone call on the Committee's behalf. Even in this wondrous age of the conference call, it is silly to think that the entire Committee should have had to get on the line with petitioner Schellenbach to negotiate a settlement.

■ Schellenbach further argues that NASD rules allow only for complaints against members to be initiated by a member of the public, by the District Committee, or the Board of Governors, and that the complaint against him was improperly inspired by "rogue" NASD staff members (petitioner's brief at 22, citing NASD Rules of Fair Practice, Article III §§ 2, 3, 4). Petitioner theorizes that NASD staff members had decided to exonerate him, as evidenced by the Sampat letter, but resurrected the investigation after the FBI became involved. These "rogue" NASD staff members, petitioner claims, realized that they would look bad if criminal charges were later brought for violations the NASD had excused. Schellenbach deduces that it was the staff rather than the disciplinary committee that developed the complaint against him because of the Sam-

pat letter, the "long, unexplained interval between the time the NASD staff investigated Schellenbach and the time the complaint was filed," and the settlement negotiations during which "rogue staff members abruptly sought to induce Schellenbach to accept the death penalty."[1] None of these facts suggests the inference drawn by petitioner that the case against him was initiated by the staff. In fact, Schellenbach himself contradicts this assertion when he points out that three owner-investors brought his violations to the attention of the NASD. Nor is it obvious that NASD staff members may not bring proceedings against a member. The NASD Rules of Fair Practice are hardly narrow—they grant standing to members of the public. NASD employees are surely members of the public; they also act at the direction of the NASD Board of Governors and the District Committee, and both bodies are able to initiate complaints against NASD members.

 Petitioner's larger point is that NASD staff members were out to get him to make themselves look good. Petitioner has no more evidence of this evil intent than he has of the staff's initiating the complaint against him. Schellenbach's arguments have an Oliver Stone quality to them that at times border on paranoia. At one point petitioner says:

Although it was the FBI which stirred up the rogue staff, the FBI never pursued Schellenbach. It is time for the rogue staff to call it quits, too. In fact, everybody should call it quits. The NASD and the SEC should call it quits. They have all had their chance. Something smells bad, and, first, the District Business Conduct Committee chose not to notice it. Then the Board of Governors chose not to notice it and then chose not to reconsider their not noticing it. Finally the SEC chose not to notice it.

(Petitioner's reply brief at 9). We need not ponder petitioner's theories about a conspiracy among "rogue" staff members,

however, because courts will not inquire into a prosecutor's ill motive unless there is a showing of selective enforcement, *United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 2205, 60 L.Ed.2d 755 (1979), or an attempt to discriminate by arbitrary classification, *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). NASD disciplinary proceedings are treated as an exercise of prosecutorial discretion. See *First Jersey Securities, Inc. v. Bergen*, 605 F.2d 690, 696 (3d Cir.1979), certiorari denied, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *Butz v. Economou*, 438 U.S. 478, 515, 98 S.Ct. 2894, 2915, 57 L.Ed.2d 895 ("An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought"). Prosecutors' decisions to initiate investigations are given wide latitude. *United States v. Goodwin*, 457 U.S. 368, 380 n. 11, 102 S.Ct. 2485, 2492 n. 11, 73 L.Ed.2d 74 (" 'The conscious exercise of some selectivity in enforcement is not itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification' ") (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604). Thus the motives of NASD staff members are irrelevant.

 In fact, all of Schellenbach's dealings with the NASD are irrelevant under our decisions in *Mister Discount*, 768 F.2d at 877, and *Shultz*, 614 F.2d at 568. In those cases we held that because the SEC undertakes an independent review of facts and law, we will not consider errors in NASD proceedings unless those errors "infected the Commission's action by leading to error on its part." *Id.* Petitioner has not alleged that the "rogues" in the NASD infiltrated the SEC or that the Commission acted improperly. In fact, the Commission's decision explicitly considered and rejected Schellenbach's arguments about "rogue" staff members: "We discern no valid basis for Schellenbach's contentions

---

**1.** Death penalty is an unfortunate term used by petitioner to describe a lifetime ban on acting as

a principal in an NASD-member firm.

that the NASD's District Committee and Board of Governors were prejudiced against him due to staff hostility, or that the NASD failed to provide a 'proper rationale' for its action." *In re Peter W. Schellenbach*, SEC Admin.Proc. File No. 3–7315 at 8–9 n. 24. Because the SEC's review was independent and not contaminated by the bias Schellenbach claims to have detected among NASD staff members, the thirty-odd pages of petitioner's briefs dedicated to attacking NASD staff members are beside the point.[2] *Mister Discount*, 768 F.2d at 877.

■ Petitioner makes two final arguments: first, that the SEC ignored evidence of his good character including the testimony of eleven "substantial witnesses" that Schellenbach is "incapable of deception" (petitioner's brief at 34), and second, that the $50,000 fine and lifetime ban on acting as a principal are too severe. Schellenbach recognizes that the SEC has wide discretion to impose sanctions, but says that his long record of honesty and the fact that no customers suffered financial deprivation because of his violations should lessen the sentence. An action brought by the Commission, however, unlike a private damage suit, need not include proof of harm. *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985) ("Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money"). Securities regulations are designed to protect the general public. *Allan v. SEC*, 577 F.2d 388, 392 (7th Cir.1978). Schellenbach's falsification of records exposed Brook's customers to undue risk and it deprived investors of the protections Congress and the executive branch have put in place. See *Blaise D'Antoni & Assoc. v. SEC*, 289 F.2d 276, 277 (5th Cir.1961), certiorari denied, 368 U.S. 899, 82 S.Ct. 178, 7 L.Ed.2d 95; *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir.1980)

(false statements of company's financial status are almost always material). Moreover, Schellenbach admits that while no customers lost money as such, twenty-three owners of Brook did lose their investments. Thus Schellenbach's depiction of his crime as a victimless offense is inaccurate. As Chief Judge J. Skelly Wright said, "Dissemination of false or misleading information by companies to members of the investing public may distort the efficient workings of the securities market and injure investors who rely on the accuracy and completeness of the company's public disclosures." *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1377 (D.C.Cir.1980), certiorari denied, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289. Schellenbach's violations are severe and the SEC's punishment is appropriate. The SEC's judgment is affirmed.

■ As a final matter, we note that petitioner's brief is filled with unsubstantiated accusations about individuals who work for the NASD. At one point petitioner offers the sentence: "Of all the particular sanctions, perhaps the $50,000 fine is the most insidious still-existing afterbirth of the rogue staff's original death penalty" (petitioner's reply brief at 5). As discussed above, petitioner lacks both a solid factual grounding for such extreme charges, and the legal basis to support them. In fifty pages of purported legal argument (including the reply brief), petitioner cites just one case—which is not on point—but manages to use the word "rogue" no fewer than fifty-eight times, always in connection with the NASD staff. Rogue means an unprincipled person or scoundrel. AMERICAN HERITAGE DICTIONARY, 2d College ed. (1982). This slur is doubly inappropriate; Schellenbach cannot prove illicit behavior or motive on the part of NASD staff members, and their motives could not provide a basis to overturn an SEC judgment. Therefore, we order petitioner's counsel to submit a statement within 14 days of the date of this decision explaining why they or their client,

---

2. Petitioner may also have waived these arguments about NASD misconduct by not raising them at length before the SEC. See *Mister Discount*, 768 F.2d at 877–878 (petitioner must establish reasonable grounds for failure to raise

issue before Commission). The SEC argued the waiver issue to this Court, but petitioner failed to address it in his papers. Because of our disposition of the case, we need not consider the matter in detail.

or both, should not be subject to Federal Rule of Appellate Procedure 38 and sanctioned for filing a frivolous appeal. See *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 938 (7th Cir.1989) (en banc); *Williams v. United States Postal Service*, 873 F.2d 1069, 1075 (7th Cir.1989); *Mays v. Chicago Sun–Times*, 865 F.2d 134, 138 (7th Cir.1989), certiorari denied, 493 U.S. 900, 110 S.Ct. 259, 107 L.Ed.2d 209; *Kale v. Obuchowski*, 985 F.2d 360, 362 (7th Cir.1993); *In re Hendrix*, 986 F.2d 195, 200–01 (7th Cir.1993).

Judgment affirmed.