Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 22, 2009         Decided January 15, 2010

No. 09-1074

GARY M. KORNMAN,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

---

On Petition for Review of an Order
of the Securities & Exchange Commission

---

*Barry S. Pollack* argued the cause and filed the briefs for petitioner. *Jeffrey M. Karp* entered an appearance.

*Dominick V. Freda*, Senior Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief was *David M. Becker*, General Counsel, *Jacob H. Stillman*, Solicitor, and *Randall W. Quinn*, Assistant General Counsel. *William K. Shirey II*, Counsel, entered an appearance.

Before: ROGERS, GARLAND and KAVANAUGH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The Securities and Exchange Commission permanently barred Gary M. Kornman from association with any broker, dealer, or investment adviser pursuant to section 15(b) of the Securities and Exchange Act of 1934 and section 203(f) of the Investment Advisers Act of 1940. Kornman challenges the Commission's decision to bar his association as an investment adviser on two principal grounds: first, there was not substantial evidence in the record to support the finding that he was an investment adviser at the time of the "alleged misconduct," and, second, the Commission abused its discretion by giving inadequate consideration to mitigating factors and to whether lesser sanctions would serve the public interest. The court's review of the Commission's remedial decisions is deferential, *see Horning v. SEC*, 570 F.3d 337, 343 (D.C. Cir. 2009), and we deny the petition.

**I.**

In December 2006, Kornman was indicted in the Northern District of Texas, on two counts of securities fraud involving alleged insider trading, one count of providing false statements to the Commission, and one count of obstruction of justice. He entered a plea to one count of making a false statement in violation of 18 U.S.C. § 1001, for which he could have been sentenced to five years' imprisonment, followed by three years' supervised release, and ordered to pay a $250,000 fine, to make restitution, and to pay any costs of incarceration and supervision. As part of his plea agreement Kornman stipulated in a Factual Resume that during a telephone conversation with Commission investigators on October 29, 2003, he falsely stated

that he did not know who possessed trading authority over the brokerage account for a hedge fund through which he conducted trading activity in publicly traded stock. He further stipulated that he "knew that he personally possessed [that] authority." Factual Resume 2. His stipulation continued: "In addition, the defendant made the statement intentionally, knowing that it was false. Further, the statement was material. Finally, the defendant made the false statement for the purpose of misleading the Securities and Exchange Commission in its investigation into his trading activity." *Id.*

On July 11, 2007, the district court sentenced Kornman to two years' supervised probation and ordered him to pay a fine of $143,465, the amount the government claimed was unjust enrichment from insider trading, along with a $100 special assessment. The district court dismissed the remaining counts upon motion of the United States.

On July 30, 2007, the Commission instituted administrative proceedings based on three allegations by the Division of Enforcement ("Division").[1] In response, Kornman admitted: he

---

[1] The Division alleged:

> A. From May 1992 to October 2006, Kornman owned Heritage Securities Corporation, a registered broker-dealer. In addition, Kornman individually held Series 6 and 63 securities licenses and was a registered representative of Heritage Securities Corporation. He also controlled a limited liability company that served as an investment adviser to two Kornman-controlled hedge funds. Kornman, 63 years old, is a resident of Dallas, Texas.

> B. On April 9, 2007, Kornman pled guilty to one count of making a false statement to the SEC in

4

owned an ownership interest in Heritage Security Corporation and was a registered representative of it; he held Series 6 and 63 securities licenses; and he controlled a limited liability company and had participated in trades for "two hedge-type funds." Answer to Corrected Order Instituting Administrative Proceedings ¶ 6. He also admitted pleading guilty to making "a single false statement," and that "a factual resume accompanied his plea agreement, the content of which speaks for itself." *Id.*

---

connection with its investigation into his trades in MiniMed common stock, in violation of Title 18 United States Code, Section 1001. Kornman entered his guilty plea before the United States District Court for the Northern District of Texas, in *United States v. Gary M. Kornman*, Crim. No. 3:05-CR-0298-P. On July 11, 2007, a judgment of conviction in the criminal case was entered against Kornman. He was sentenced to two years of supervised probation and ordered to pay $ 143,465.

C. The criminal count to which Kornman pled guilty alleged that Kornman stated falsely to the [Commission] that he did not know who possessed trading authority over the brokerage account for a hedge fund through which he conducted trading in MiniMed stock in February 2001. In the factual resume accompanying the plea agreement, Kornman admitted that: the statement was false; he knew that he personally possessed trading authority over the brokerage account; he made the statement intentionally, knowing that it was both false and material to the [Commission]'s investigation; and he made the false and material statement for the purpose of misleading the [Commission] in its investigation into his MiniMed trading activity.

Order Instituting Administrative Proceedings 1–2.

at ¶ 8. He denied, however, "any implication that his statement to [the Commission] attorneys [during the October 29, 2003 telephone call] interfered with their investigation or otherwise affected any investor." *Id.* Additionally, he argued that mitigating factors required rejection in whole or in part of the request for relief and raised various affirmative defenses, including double jeopardy.

The Division moved for summary disposition pursuant to Rule 250 of the Commission's Rules of Practice, 17 C.F.R. § 201.250. It attached eleven exhibits to the motion relating to Kornman's business associations and his criminal conviction.[2]

---

[2] The eleven exhibits were:

Exhibit 1: Heritage Securities Corporation registration, granted May 29, 1992, on file in the State of Delaware October 18, 2006.

Exhibit 2: Certificate of Limited Partnership of Heritage Capital Partners, I, L.P., filed October 6, 1998, listing Heritage Advisory Group, L.L.C. as the general partner of Capital Partners I, and Delaware Certificate of Good Standing for Heritage Capital Partners, I, L.P., filed June 9, 2005.

Exhibit 3: Certificate of Limited Partnership of Heritage Capital Opportunities Fund I, L.P., filed September 13, 1999, listing Heritage Advisory Group as the general partner of the Fund, and Certificate of Good Standing for Heritage Capital Opportunities Fund I, L.P., filed June 9, 2005.

Exhibit 4: Deposition of Gary M. Kornman before the American Arbitration Association of Dallas, Texas, January 29, 2004.

Exhibit 5: Declaration of Cory D. Childs, August 30, 2007.

Exhibit 5A: Heritage Capital Partners I, L.P. Private Offering Memorandum for Offering of Limited Partnership Interests ($250,000 Minimum Investment) of October 6, 1998, listing Heritage Advisory Group as the general partner managing Capital Partners I.

Exhibit 5B: Heritage Capital Opportunities Fund I, L.P. Private Offering Memorandum for Offering of Limited Partnership

Citing Commission precedent that summary disposition was well suited to proceedings based on a respondent's criminal conviction,[3] particularly in light of Commission precedent "not permit[ting] criminal convictions to be collaterally attacked in its administrative proceedings," *Jose P. Zollino*, Release No. 308, 2006 WL 507940 at *3 (Mar. 2, 2006), the Division argued that a permanent bar on association should be imposed in light of Kornman's admissions of his association with the Heritage Security Corporation, a broker-dealer, and of his control of Heritage Advisory Group, a limited liability company that managed "two hedge-type funds," and the evidence the hedge funds were in good standing through at least June 9, 2005. The

---

Interests ($250,000 Minimum Investment) of October 17, 1999, listing Heritage Advisory Group as general partner managing the Fund.

Exhibit 6: Indictment and superceding indictments filed in the United States District Court for the Northern District of Texas, Dallas Division, December 20, 2006.

Exhibit 7: Plea Agreement, filed April 9, 2007.

Exhibit 8: Judgment of conviction, filed July 13, 2007.

Exhibit 9: Factual Resume, filed with Plea Agreement on April 9, 2007.

Exhibit 10: Transcript of sentencing hearing of July 11, 2007.

Exhibit 11: Testimony of Cory D. Childs at Commission hearing on March 9, 2004.

[3] The Division cited: *John S. Brownson*, Release No. 46,161, 77 SEC Docket 3097, 2002 WL 1438186 at *2 (July 3, 2002), *pet. denied*, *Brownson v. SEC*, 66 Fed. Appx. 687 (9th Cir. 2003); *Richard P. Capillari and Thomas J. Connolly*, Release No. 237, 81 SEC Docket 633, 2003 WL 22250402 at *2 (Sept. 30, 2003); *see Adoption of Amendments to the Rules of Practice and Related Provisions*, Release No. 52846, 86 SEC Docket 1931, 2005 WL 3199273 at *3 (Apr. 21, 2005) (noting that motions for summary disposition are often made where a respondent has been criminally convicted or an injunction has been entered and the conviction or injunction provides the basis for an administrative order against the respondent).

Division argued that the only reasonable conclusion to be drawn from the evidence was that Kornman continued to act as a broker-dealer through the Heritage Security Corporation and as an investment adviser, for compensation, through his association with the Heritage Advisory Group at the time of the October 29, 2003 telephone conversation with Commission investigators when he falsely denied knowing who managed one of the hedge fund portfolios. Consistent with the factors set forth in *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), the Division argued that in view of his conviction it was in the public interest to impose a permanent bar.

Kornman filed an opposition. He argued that he had a statutory right to a hearing and that discovery was necessary regarding the conduct of the Commission staff involved in the October 29, 2003 telephone call.[4] He asserted that he was no longer associated with a broker or dealer at the time of his 2007 conviction and that he was no longer acting as or associated with an investment adviser for compensation at the time of the telephone conversation. He also argued, in view of evidence in mitigation, that the Division had failed to show that no lesser sanction than a permanent bar would satisfy the public interest. Kornman attached various documents to his opposition, including a partial transcript of the October 29, 2003 telephone

---

[4] Kornman sought discovery of documents and other evidence reflecting whether the Commission attorneys who participated in the October 29, 2003 telephone call: (1) knew that he was represented by counsel in pending matters, (2) were working with criminal investigators at the time of the call, and (3) had the information they were requesting from him during the telephone call. He also sought discovery on "when and how government attorneys became aware that at least one witness on whom the government relied coached any witnesses against [] Kornman," and the attorneys' notes "from the telephone conversation." Opp'n to Mot. for Summ. Disposition 10.

call and letters attesting to his good character.[5] He also attached his affidavit admitting the underlying conduct, expressing regret for his conduct, accepting "full responsibility for the misconduct during the telephone call," and promising "not [to] repeat anything of the sort in the future," Kornman Aff. ¶¶ 8–15. The Division responded that Kornman's requests for discovery to present mitigating circumstances were irrelevant and sought to relitigate facts previously established in the criminal record, and that his ethical attacks on the Commission investigators were baseless and inaccurate, as evidenced in the complete transcript of the telephone call, which the Division attached as Exhibit 12.[6]

---

[5] The other documents were: Martindale-Hubbell profiles of the Commission investigators; the State of Texas Rules of Disciplinary Procedure on restrictions on lawyers' communication with parties; a document indicating that a lawyer in Pennsylvania had received only a one-year disbarment upon conviction of 18 U.S.C. § 1001 for failing to disclose to the Commission during an investigation; and a segment from a district court opinion granting Kornman limited discovery in the civil enforcement proceeding then pending against him in the Northern District of Texas. Also attached were a call log entry and handwritten notes regarding a government witness and one of Kornman's former co-workers; a declaration of Philip Asquith, who did business with MiniMed, which was a subject of the insider trading investigation; and a newspaper article about a lawsuit against Jack Pratt, a government witness, regarding his business dealings with Hollywood Casino, which was also a subject of the insider trading investigation.

[6] At the beginning of the telephone call the Commission investigators offered Kornman the opportunity to confer with counsel before they asked him any questions or he continued to speak with them. (Ex. 12 at 5–6.). The transcript also indicates Kornman was aware that he could refuse at any time to continue speaking with the investigators. (Ex. 12 at 20, 25, 27–28).

An administrative law judge ("ALJ") granted the Division's motion for summary disposition and permanently barred Kornman from association with any broker-dealer or investment adviser, based on his 2007 conviction for violating 18 U.S.C. § 1001. *Gary M. Kornman*, Release No. 335, 91 SEC Docket 2234 (Oct. 9, 2007) ("*Initial Decision*"). The ALJ found the evidence showed that Kornman was associated with Heritage Securities Corporation, a registered broker-dealer from 1992 to October 2006, and that he was associated with the Heritage Advisory Group, a limited liability company that was the general partner of two hedge funds — Heritage Capital Partners I, L.P. and Heritage Capital Opportunities Fund I, L.P. (*See supra* note 2, Exs. 5A at 10, 17 & 5B at 10, 17.) The ALJ also found that the hedge funds' respective 1998 and 1999 private offering memoranda included provisions for payment of fees for managing the hedge funds' portfolios. (*See id.,* Exs. 5A at 18–19, 5B at 18–19.) Further, the ALJ found that the certificates by the Secretary of the State of Delaware showed the hedge funds were still in existence as of June 2005. (*See id.,* Exs. 2 & 3.) The ALJ noted: "Kornman does not take issue with this material fact. In fact, he avoids doing so by stating obliquely, 'Nothing in the record suggests that trades of Heritage Advisory Services in the open market did not cease before the telephone call at issue.' Opposition at 19." *Initial Decision* at 5 n.3. The ALJ rejected Kornman's legal defenses, including double jeopardy, and concluded that a permanent bar was required because "Kornman's conviction involved dishonesty and opportunities for dishonesty recur constantly in the securities industry." *Id.* at 9.

Kornman petitioned for review by the Commission on several grounds, including: (1) he had been denied his statutory right to a hearing because the ALJ had failed to take as true all the facts in his pleadings, specifically his vow not to repeat his misconduct; (2) the ALJ had failed "to review the sufficiency of

evidence supposedly reflecting that, at the time of the October 29, 2003, telephone call at issue, Mr. Kornman or any entity with which he was associated was actually 'for compensation engage[ing] [sic] in the business of advising others' regarding securities investments," Pet. for Review at 3–4; and (3) a permanent bar was inappropriate in view of the evidence in mitigation, including that this was a solitary blemish on his business activities over three decades. The Division opposed the petition and attached the twelve exhibits that were before the ALJ.

Upon "independent review" of the disputed record evidence, the Commission concluded it was in the public interest to permanently bar Kornman from association with any broker, dealer, or investment adviser. *Gary M. Kornman*, Release No. 2840 at 1–2, 25, 2009 WL 367635 (Feb. 13, 2009)("*Decision*"). The Commission affirmed that under section 15(b)(6)(A) of the Exchange Act and section 203(f) of the Advisers Act, the relevant date for purposes of its jurisdiction with regard to "the time of the alleged misconduct" was "October 29, 2003, the day on which [Kornman] provided his false statement to Commission investigators." *Id.* at 9. The Commission found there was undisputed evidence of Kornman's status as a broker-dealer and investment adviser, by virtue of his association with the Heritage Advisory Group, when he made the false statement, and thus it had jurisdiction to sanction him upon determining it was in the public interest to do so. The Commission noted that "[t]he record, including private offering memoranda from the [h]edge [f]unds, reflects that [the] Heritage Advisory [Group] served as the general partner to the [h]edge [f]unds, managing their investment portfolios and earning fees and other compensation for such services." *Id*. at 6–7. Referencing the hedge funds' quarterly and annual fees that Kornman received for managing their portfolios, the Commission observed, in responding to Kornman's challenge to the sufficiency of the

evidence that the Heritage Advisory Group was an investment adviser for compensation on October 28, 2003:

> Kornman provides no evidence for his claim that the [h]edge [f]unds ceased operating or receiving these fees by October 2003. To the contrary, certificates from Delaware's Secretary of State show that the Hedge Funds remained active and in good standing in that State through at least June 9, 2005, and that Heritage Advisory [Group] remained manager of the [h]edge [f]unds as their general partner.

*Id.* at 9–10 (internal quotations omitted). Addressing the factors set forth in *Steadman*, 603 F.2d. at 1140, while noting that its inquiry is "a flexible one, and no one factor is dispositive," *Decision* at 10, the Commission concluded:

> The conduct underlying Kornman's conviction was egregious. His conviction was for making a material false statement to a federal official, and he admitted he did so intentionally and for the purpose of misleading our investigation. As we have stated: "The securities industry presents a great many opportunities for abuse and overreaching, and depends very heavily on the integrity of its participants." Indeed, the importance of honesty for a securities professional is so paramount that we have barred individuals even when the conviction was based on dishonest conduct unrelated to securities transactions or securities business. Here, the egregiousness of Kornman's dishonest behavior is compounded because he made his false statement to Commission staff during an ongoing investigation into possible insider trading violations. Providing information to investigators is important to the effectiveness of the regulatory system,

and the information provided must be truthful. We have consistently held that deliberate deception of regulatory authorities justifies the severest of sanctions.

*Id.* at 10–11(internal citations omitted). The Commission also noted his conduct exhibited "a high degree of scienter," *id*. at 11, referencing his stipulation in the Factual Resume accompanying his plea. The Commission rejected Kornman's other legal challenges and found inapposite the cases he cited in urging that only a censure should be imposed. Kornman petitions for review.

## II.

Kornman's contentions about his right to a hearing and the lack of substantial evidence to support the Commission's finding that he was an "investment adviser" at the time of the "alleged misconduct" present two issues of statutory interpretation. We address them first, before turning to his challenge to the sufficiency of the record evidence before the Commission.

Section 203(f) of the Investment Advisers Act limits the jurisdiction for the Commission to issue sanctions related to a party's future association as an "investment adviser." It provides, in relevant part:

> The Commission, by order, shall censure or place limitations on the activities of any person associated, seeking to become associated, or, *at the time of the alleged misconduct*, associated or seeking to become associated with an investment adviser, or suspend for a period not exceeding twelve months or bar any such person from being associated with an investment adviser, if the Commission finds, on the record after notice and *opportunity for hearing*, that such censure,

> placing of limitations, suspension, or bar is in the public interest . . . .

15 U.S.C. § 80b-3(f)(emphasis added). An "investment adviser" is defined as

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . . .

*Id.* § 80b-2(a)(11).

### A.

The Commission's interpretation of its authorizing statutes is entitled to deference under the familiar two-pronged test set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Where Congress has made its intent clear, that is the end of the matter, but if the statute is ambiguous, the court must determine whether the agency's interpretation is permissible. *Id.* at 842–843; *see also SEC v. Zandford*, 535 U.S. 813, 819–20 (2002). Similarly, the court will defer to an agency's reasonable interpretation of its regulations. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

**1.** The Commission interpreted the phrase "on the record after notice and opportunity for hearing" in section 203(f) of the Advisers Act, 15 U.S.C. § 80b-3(f), to allow summary proceedings. *Decision* at 17–18. This is at least a "permissible construction of the statute." *Chevron*, 467 U.S. at 843. Rule 250 of the Commission's Rules of Practice provides for summary disposition in the absence of a genuine issue of

material fact. Under Rule 250, a motion for summary disposition may be granted where there is "no genuine issue with regard to any material fact and the party making the motion is entitled to a summary disposition as a matter of law." 17 C.F.R. § 201.250(b). The Rule also provides that "[t]he facts of the pleadings of the party against whom the motion is made shall be taken as true, except as modified by stipulations or admissions made by that party, by uncontested affidavits, or by facts officially noted." *Id.* § 201.250(a). Further, the hearing officer "shall deny or defer the motion" if "it appears that a party, for good cause shown, cannot present by affidavit prior to hearing facts essential to justify opposition to the motion." *Id.* § 201.250(b). The Commission modeled Rule 250 on Rule 56 of the Federal Rules of Civil Procedure. *See Jeffrey L. Gibson*, Rel. No. 57266, 92 SEC Docket 2104 at 2112 n. 26 (Feb. 4, 2008).

The plain text of section 80b-3(f) requires the "opportunity for hearing" without defining the word "hearing." The Commission's rule reflects a well-established distinction between a hearing on the pleadings and an evidentiary hearing at which witnesses testify and are subject to cross-examination. *See, e.g.*, *Costle v. Pac. Legal Found.*, 445 U.S. 198, 213–14 (1980); *United States v. Storer Broad. Co.*, 351 U.S. 192, 202, 205 (1956) . For example, in *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 621 (1973), the Supreme Court construed text virtually identical to the Advisers Act in concluding that the phrase "notice and opportunity for hearing to the applicant" did not always require an evidentiary hearing because "[w]e cannot impute to Congress the design of requiring, nor does due process demand, a hearing when it appears conclusively from the applicant's 'pleadings' that the application cannot succeed." Although this court has not previously decided whether the Advisers Act requires an evidentiary hearing in all cases, *Seghers v. SEC*, 548 F.3d 129,

133–34 (D.C. Cir. 2008), it has interpreted similar language in the Food Drug and Cosmetic Act, 21 U.S.C. § 355(e)(3), not to require an evidentiary hearing where there is "no genuine and substantial issue of fact that requires a hearing." *John D. Copanos & Sons, Inc. v. Food & Drug Admin.*, 854 F.2d 510, 518 (D.C. Cir. 1988); *see also Crestview Parke Care Ctr. v. Thompson*, 373 F.3d 743, 750 (6th Cir. 2004); *Puerto Rico Aqueduct & Sewer Auth. v. EPA*, 35 F.3d 600, 606 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 1096 (1995); 1 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 8.3, pp. 542–43 (4th ed. 2002).

For these reasons, Kornman's contention that the plain language requires an evidentiary hearing in all cases is not supportable. In promulgating Rule 250 the Commission explained that summary disposition would be available in disciplinary cases, although noting that such cases "are likely to be less common" than in regulatory proceedings because "[t]ypically, enforcement and disciplinary proceedings that reach litigation involve genuine disagreement between the parties as to material facts." Rules of Practice, 60 Fed. Reg. 32738-01, 32,767 (Jun. 23, 1995). However, in later amending Rule 250, the Commission acknowledged that in practice "[m]otions for summary dispositions are often made in cases where a respondent has been criminally convicted." Adoption of Amendments to Rules of Practice, 70 Fed. Reg. 72566-01, 72567 (Dec. 5, 2005). For example, in *John S. Brownson*, Release No. 46,161, 77 SEC Docket 3097, 2002 WL 1438186 at *2 (July 3, 2002), *pet. denied*, *Brownson v. SEC*, 66 Fed. Appx. 687 (9th Cir. 2003), the Commission had stated that "[s]ummary disposition is particularly appropriate where, as here, a respondent has pled guilty to securities fraud." *See also supra* note 3. Presumably this is so because in most instances the criminal proceeding has resolved the central issue concerning the nature of the "alleged misconduct" and only the

question of the appropriate sanction remains. For certain types of criminal conduct, the Commission has warned that only "extraordinary mitigating circumstances" are likely to affect its determination of the sanction required in the public interest. *Brownson*, 77 SEC Docket 3097, 2002 WL 1438186 at *2.

Kornman cannot successfully deny that he was afforded the "opportunity for hearing." The Commission informed him in writing of the allegations against him, and he filed a written response to the allegations. He also had the opportunity to challenge the arguments and evidence proffered by the Division in moving for summary disposition pursuant to Rule 250, and he did so by filing an opposition and attaching documents. Kornman does not suggest he was denied an opportunity to set forth all of his evidence, challenges, and defenses in his pleadings before the ALJ's *Initial Decision* and the Commission's subsequent *Decision*. Because the Commission proceedings against Kornman were based on the record in his criminal case that disposed of the central issue regarding the nature of his "alleged misconduct" for administrative enforcement purposes, a summary proceeding was appropriate under Commission precedent.[7]  *See, e.g.*, *Brownson*, 77 SEC Docket 3097, 2002 WL 1438186 at *2; *Capillari*, 81 SEC Docket 633, 2003 WL 22250402 at *2.

---

[7] The Commission ordered additional briefing "regarding the impact of Kornman's conviction of a felony involving the violation of chapter 47 of title 18 of the United States Code on the Commission's authority to institute this proceeding." Order Directing the Filing of Additional Briefs 1 (Apr. 24, 2008). The Division responded, citing section 15(b)(4)(B)(iv) of the Exchange Act of 1934 and section 230(e)(2)(D) of the Advisers Act, that a conviction of fraud was unnecessary because a violation of 18 U.S.C. § 1001 falls within Chapter 47 where the misconduct arises out of the conduct of the business of a broker-dealer or investment adviser. Kornman does not challenge this legal conclusion.

**2.** The Commission interpreted the phrase "at the time of the alleged misconduct" in section 203(f) of the Advisers' Act, 15 U.S.C. § 80b-3(f), to refer not to Kornman's 2007 conviction, as Kornman urged, but to his false statement to Commission investigators during the October 29, 2003 telephone call on which his conviction under 18 U.S.C § 1001 was based. *Decision* at 9. This interpretation reflects the plain text of the statute, *id.* at 9 & n.22, and is, in any event, reasonable even if the text is ambiguous, *cf. Teicher v. SEC*, 177 F.3d 1016, 1021 (D.C. Cir 1999). The Commission noted that section 80b-3(f) refers to the "alleged misconduct," not the "alleged event" as Kornman's interpretation implied. *Decision* at 9. The Commission also relied on legislative history indicating that Congress had enacted the current text to make clear its original intent that misconduct during a past association as well as during a present occasion subjects a person to administrative proceedings and sanctions under the Exchange and Advisers Acts. *Id.* at 9 n.23 (citing S. Rep. No. 100–105, at 2111 (1987)).[8] The Commission pointed to its precedent explaining that to hold otherwise "would allow persons who violate the law while employed in the securities business to avoid administrative sanctions simply by leaving the business." *John Kilpatrick*, Release No. 23251, 35 SEC Docket 914, 1986 WL 626187 at * 5 (May 19, 1986).

The Commission properly relied on the ordinary meaning of alleged "misconduct," which refers to allegedly "unlawful or

---

[8] The Senate Report states that amending the statute to read "at the time of the alleged misconduct" in Exchange Act section 15(b)(6) and Advisers Act section 203(f) was meant to "make clear Congress' original intent that misconduct during a *past* association . . . as well as during a *present* . . . association, subjects a person to administrative proceedings and sanctions." S. Rep. No. 100–105, at 2111 (emphasis in original).

improper behavior," *Black's Law Dictionary* 1013 (7th ed. 1999). *See Limtiaco v. Comacho*, 549 U.S. 483, 488-89 (2007); *cf. Gonzales v. Oregon*, 546 U.S. 243, 274 (2006). So too, it could properly rely on the legislative history, *see Chevron*, 467 U.S. at 843 n.9, 845, and on its own precedent interpreting congressional intent.

Kornman's contention that after his conviction his misconduct was no longer "alleged misconduct" is "nonsensical." Resp't Br. 15. It would mean no conviction that establishes the central issues regarding the "alleged misconduct" as violations of law would ever satisfy the statutory text. Yet, as the Commission noted, Congress has authorized the Commission to discipline persons who have been convicted of crimes that suggest a lack of fitness to remain in the securities industry. *Decision* at 5 & n. 11 and 6 n. 13; *see* 15 U.S.C. § 80b-3(e)(3)(A); § 80b-3(f). The misconduct thus remains "alleged" for purposes of the Commission's enforcement proceedings even after a criminal conviction based on the same underlying conduct. Kornman's contrary interpretation would undermine Congress' intent to ensure that past associations are subject to Commission authority.

**B.**

Turning to Kornman's challenge to the sufficiency of the evidence, the court not only "must uphold [the Commission's] [legal] determinations unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *Horning*, 570 F.3d at 343 (internal quotations omitted), but it must also treat the Commission's findings of fact as final if they are supported by substantial evidence in the record, *id.* "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v.*

*NLRB*, 305 U.S. 197, 229 (1938); *see Steadman v. SEC*, 450 U.S. 91, 101 n.21 (1981).

The Commission's finding that on October 29, 2003, Kornman was associated with an "investment adviser" as the organizer of the Heritage Advisory Group, L.L.C., which managed the portfolios of two hedge funds, is supported by substantial evidence in the record. In responding to the Division's allegations, Kornman admitted that he controlled a limited liability company and had traded for "two hedge-type funds." In opposing summary disposition, he proffered no evidence to contradict either his admissions or the Division's evidence. The undisputed record evidence before the Commission showed that Kornman organized the Heritage Advisory Group as a limited liability company, which served as the general partner of the two hedge funds, (*see supra* note 2, Exs. 2, 3, 5A & 5B) and according to official state records, the two hedge funds remained in good standing at least through June 2005, (*see id.* Exs. 2 & 3) a status in part dependent upon the funds having paid any state taxes that were due, DEL. CODE ANN. tit. 6, § 17-203 (2009). The hedge funds' private offering memoranda required the payment of quarterly and annual fees for management of the funds' portfolios. (*See supra* note 2, Exs. 5A at 18–19 & 5B at 18–19.) Cory D. Childs, a former employee of the Heritage Advisory Group, provided sworn statements describing how Kornman managed the portfolios of the two hedge funds at least until June 2003 when Childs left his job. (*See id.*, Exs. 5 and 11.)

It is true, as Kornman points out, that there was no record evidence that either of the hedge funds were still engaged in trading in October 2003. But under Rule 250, which the Commission modeled on Federal Rule of Civil Procedure 56, the burden on the Division was to proffer evidence to demonstrate why summary disposition was appropriate. To do so the

Division did not have to proffer evidence of actual trades in October 2003 if the evidence proffered sufficed to raise a reasonable inference that Kornman continued, for compensation, to manage the funds' portfolios. *Cf. Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); FED. R. CIV. P. 56(c)(2). The hedge funds' private offering memoranda did not establish a trading schedule. (*See supra* note 2, Exs.5A & 5B.) The absence of trading around the time of the October 29, 2003 telephone call would, moreover, be consistent with Childs' deposition about how Kornman managed the hedge funds' portfolios: Kornman would call Childs from time to time to make trades for "whichever [fund] had the money at the time"; there was no set schedule for trading. Ex. 11 at 23–24, *supra* note 2. Because the evidence proffered by the Division sufficed to support the reasonable inference that the hedge funds remained active until at least June 2005, the burden under Rule 250, as under Civil Rule 56, shifted to Kornman to proffer evidence that trading had ceased before the October 29, 2003 telephone call. *Cf. Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 252 (1986); FED. R. CIV. P. 56(e)(2).

Contrary to Kornman's contention on brief, there was no record evidence that the Heritage Advisory Group ceased to function for compensation as an investment adviser for the two hedge funds after June 2003. Childs described Kornman's active involvement in managing their portfolios during Childs' employment, which began in March 2000 and ended in June 2003. (*See supra* note 2, Ex. 11 at 19.) Nothing in Childs' sworn statements, or other evidence before the Commission, suggested that Childs' leaving his job was related to the end of Kornman's active management of the hedge funds' portfolios. Instead, Childs' sworn statements indicated that when he left to pursue other interests, he was leaving an ongoing trading operation managed by Kornman. The state certificates showing that the hedge funds remained in good standing as of June 2005 supported the inference from Childs' sworn statements that

trading continued and Kornman continued in his role as the Heritage Advisory Group manager of the funds' portfolios. (*See id.*, Exs. 2, 3, 5A & 5B.)  In addition, Kornman did not deny the ongoing existence of the two hedge funds in his response to the Division's allegations.  Similarly, in his affidavit submitted in opposing the Division's Rule 250 motion he did not state that the hedge funds ceased paying him management fees prior to October 29, 2003 or that the funds had ceased to trade by then. The record of the criminal proceedings also did not indicate that he was no longer associated with the Heritage Advisory Group or did not provide, for compensation, investment advice to the hedge funds in October 2003.  (*See id.*, Exs. 7, 9, 10.)  Indeed, Kornman's sworn deposition in 2004 confirmed that at least one of the funds was still in existence — "One of those [funds] has assets and one is — is basically nothing," Ex. 4 at 23, *supra* note 2, and did not state the funds had ceased trading by October 2003. At most, Kornman's unsworn statement during the October 29, 2003 telephone call indicated that Heritage Capital Partners I, L.P. was not in business, but he did not mention, much less resolve, the status of Heritage Capital Opportunities Fund I, L.P.  (*See id.*, Ex. 12 at 7.)

The Commission, and the ALJ, noted that Kornman had made assertions that the two hedge funds had ceased trading prior to October 2003 but had proffered no evidence to support his assertions.  For example, he proffered neither certificates of dissolution of the hedge funds nor evidence of cancellation of the contractual fees, much less quarterly or annual statements documenting the absence of any trades by the hedge funds. Moreover, he never claimed that he would be unable to produce documentation to show there was no trading activity by the hedge funds in October 2003 until an evidentiary hearing was held.  *See* Rule 250(b).  Given the record evidence, the Commission could reasonably find that Kornman continued to be associated with an entity that provided investment advice for

compensation at the time he made a false statement to Commission investigators on October 29, 2003.

Kornman's contention, then, that he was entitled to an evidentiary hearing even in the absence of evidence of a material issue of disputed fact is flawed as a matter of statutory interpretation, as is his interpretation of "at the time of the alleged misconduct," and reflects a misunderstanding of the record evidence before the Commission. Although there may be circumstances when the Commission would be required to hold an evidentiary hearing even where there is a criminal conviction involving a willful intent to mislead Commission investigators, Kornman's admissions and the undisputed record evidence allowed the Commission to proceed pursuant to Rule 250. Kornman, in turn, fails to show that there is not substantial record evidence to support the Commission's finding that he was an "investment adviser" on October 29, 2003.

## III.

"It is a fundamental principle . . . that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy the relation of remedy to policy is peculiarly a matter for administrative competence." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 112 (1946) (internal quotations omitted). Because of the Commission's "accumulated experience and knowledge[,] . . . [i]ts judgment is entitled to the greatest weight. While recognizing that the Commission's discretion must square with its responsibility, only if the remedy chosen is unwarranted in law or is without justification in fact should a court attempt to intervene." *Id*. at 112–13; *see also Horning*, 570 F.3d at 343. Moreover, the Commission is not required to follow any mechanistic formula in determining an appropriate sanction. *Paz Sec., Inc. v SEC,* 566 F.3d 1172, 1175 (D.C. Cir. 2009).

The Commission concluded that "Kornman's deliberate attempt to deceive Commission investigators during an investigation into insider trading indicates a lack of honesty and integrity, as well as a fundamental unfitness to transact business associated with a broker or dealer and to advise clients as a fiduciary." *Decision* at 12. Kornman contends the Commission failed to appreciate that not every conviction involving dishonesty requires a permanent bar. He maintains the Commission imposed an automatic bar without "show[ing] with particularity the facts and policies that support those sanctions *and why less severe action would not serve to protect investors*." Pet'r's Br. at 16 (citing *Steadman*, 603 F.2d at 1137) (emphasis in original). He also faults the Commission for not allowing him to present testimony at an evidentiary hearing to rebut the assertion by the Division that a less severe sanction would not protect the public. We conclude Kornman fails to show either reversal or remand is required.

The Commission explained why, as a matter of policy, Kornman's particular misconduct warranted a bar: his conviction indicated his dishonesty was egregious because he admitted it was knowing and intentional, and, moreover, his false statement was made in the course of the Commission's investigation of wrongdoing in the industry. The Commission observed that "the importance of honesty for a securities professional is so paramount that [the Commission has] barred individuals even when the conviction was based on dishonest conduct unrelated to securities transactions or securities business." *Decision* at 11.[9] Further, the Commission noted it

---

[9] The Commission cited as examples *Ahmed Mohamed Soliman*, 52 S.E.C. 227, 230–31 (1995); *Bruce Paul*, 48 S.E.C. 126, 128–29 (1985); *Benjamin Levy Sec., Inc.*, 46 S.E.C. 1145, 1146–47 (1978); *cf. Paul K. Grassi, Jr.*, Exchange Act Rel. No. 52858 (Nov. 30, 2005), 86 S.E.C. 2494; *Boleslaw Wolny*, 53 SEC 590 (1998); *see*

has "consistently held that deliberate deception of regulatory authorities justifies the severest of sanctions." *Id.*[10] The Commission acknowledged Kornman's prior unblemished business record, his regret about making the false statement, his vow not to do so again, and even that he was personally convinced he would not repeat his misconduct. However the Commission emphasized that "[t]he securities industry presents a great many opportunities for abuse and overreaching, and depends very heavily on the integrity of its participants." *Id.* at 10–11 (internal quotations omitted).

Insofar as Kornman contends the Commission abused its discretion by imposing an automatic bar because the ALJ found that "a conviction involving dishonesty requires a bar," *Initial Decision* at 9, the Commission did not embrace this portion of the ALJ's analysis. Instead the Commission imposed the bar only after considering the mitigating factors pursuant to an analysis of the *Steadman* factors, 603 F.2d at 1140. Observing, however, that Kornman's mitigation arguments were "essentially collateral attacks on his conviction," *Decision* at 12, the Commission ruled he was estopped from doing so because the validity of Kornman's plea was not at issue and he had admitted the materiality of his false statement, a legal ruling Kornman does not challenge.[11] By pleading guilty to violating

---

*also John F. Yakimczyk*, 51 S.E.C. 56, 58 (1992); *Joseph P. D'Angelo*, 46 S.E.C. 736, 737 (1976), *aff'd without opinion*, 559 F.2d 1202 (2d Cir. 1977).

[10] As examples, the Commission cited *Peter W. Schellenbach*, 50 S.E.C. 798, 803 (1991), *aff'd*, 989 F.2d 907 (7th Cir. 1993); *Rita Delaney*, 48 S.E.C. 886, 890 (1987); *Walter B. Bull, Jr.*, 48 S.E.C. 113, 116–17 (1985).

[11] Because Kornman has conceded he is estopped from collaterally attacking the facts underlying his plea, we need not

18 U.S.C. § 1001, Kornman admitted to "knowingly and willfully -- (1) falsif[ying] . . . a material fact; (2) mak[ing] a[] materially false . . . statement or representation" "in any matter within the jurisdiction of the executive . . . branch of the Government of the United States." *Id.* § 1001(a). The Commission concluded that because willfulness was not at issue, the "exculpatory no" doctrine, *see United States v. Wiener*, 96 F.3d 35, 37 (2d Cir. 1996), was inapplicable, noting as well rejection of the doctrine in *Brogan v. United States*, 522 U.S. 398, 402–05 (1998); *see also id.* at 408–12 (Ginsburg, J. concurring). It also could reasonably reject, in view of the criminal record, Kornman's attempts to minimize the gravity of his false statement as trivial or dilatory in nature and his mental state as less than intentional.

As to other mitigation arguments — that Kornman was 63 years old, winding down his professional career, and had no prior criminal or disciplinary history — the Commission explained they did not alleviate its concern that his occupation presented opportunities for future misconduct. The Commission was also unpersuaded that, as Kornman argued, neither the Commission nor the public suffered any harm as a result of his misconduct, given the importance of integrity to the regulatory process. Neither, in the Commission's view, did Kornman's substantial financial losses mitigate the gravity of his conduct, particularly because the district court in sentencing him had taken into account that a permanent bar would likely be sought in the administrative hearings before the Commission.

On this record, Kornman cannot show either that the Commission's chosen remedy was unwarranted as a matter of policy or without justification in fact, or that the Commission

address the question left open in *Otherson v. Dep't of Justice*, 711 F.2d 267, 275 n.8, 277 n.11 (D.C. Cir. 1983).

gave inadequate consideration to the evidence offered in mitigation. Although having discretion to impose a lesser sanction, "[t]he Commission is not obligated to make its sanctions uniform," and the court "will not compare this sanction to those imposed in previous cases." *Geiger v. SEC*, 363 F.3d 481, 488 (D.C. Cir. 2004) (citing *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 186-87 (1973)). Because Kornman presented no ground for an evidentiary hearing on mitigation — for example, he did not proffer by affidavit or other evidence that he had initiated prompt efforts to correct his false statement or otherwise proffered evidence of conduct that the Commission might have deemed "extraordinary mitigating circumstances," *Brownson*, 77 SEC Docket 3097, 2002 WL 1438186 at *2 — the Commission could reasonably conclude that an evidentiary hearing on mitigation was unnecessary.

Kornman's attempt to invoke double jeopardy concerns misses the mark. The Supreme Court has long distinguished between civil sanctions and a criminal penalty based on a common underlying event. *See Helvering v. Mitchell*, 303 U.S. 391, 399 (1938). In *Hudson v. United States*, 522 U.S. 93 (1997), the Court held that the Double Jeopardy Clause does not prohibit bringing a criminal prosecution against a person debarred from the banking industry for the same misconduct during a prior civil administrative proceeding. *Id.* at 97–99. So too the reverse must be true as well. *See DiCola v. Food and Drug Admin.*, 77 F.3d 504, 505, 507-08 (D.C. Cir. 1996). By authorizing the Commission to debar investment advisers to protect the investing public, 15 U.S.C. § 80b-3(f), Congress signaled its intent that the bar be civil, *see Hudson*, 522 U.S. at 103, and Kornman has not demonstrated by the "clearest proof" that his sanction is "'so punitive in form and effect as to render [the sanction] criminal despite Congress' intent to the contrary,'" *id*. at 104 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)). The "'revocation of a privilege voluntarily

granted,' such as a debarment, 'is characteristically free of the punitive criminal element.'" *Id.* at 104 (quoting *Helvering*, 303 U.S. at 399 & n.2). That it "will deter others from emulating [the respondent's] conduct . . . is insufficient to render a sanction criminal, as deterrence 'may serve civil as well as criminal goals.'" *Id*. at 105 (quoting *Ursery*, 518 U.S. at 292); *see also DiCola*, 77 F.3d at 508. As the Commission observed, Kornman's sanction is remedial in nature because it "is designed to protect the public, and the sanction is not historically viewed as punishment," *Decision* at 22. Given the record in the criminal proceeding, the Commission's concern about allowing Kornman to continue as an investment adviser was a legitimate prophylactic remedy consistent with its statutory obligations.

Accordingly, we deny the petition for review.