# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 13, 2016          Decided August 9, 2016

No. 15-1345

RAYMOND J. LUCIA COMPANIES, INC. AND RAYMOND J.
LUCIA,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of
the Securities & Exchange Commission

*Mark A. Perry* argued the cause for petitioners. With him
on the briefs were *Jonathan C. Bond*, *Jonathan C. Dickey*, and
*Marc J. Fagel*.

*Paul D. Clement*, *Jeffrey M. Harris*, and *Christopher G.
Michel* were on the brief for *amici curiae* Ironbridge Global IV
Ltd. and Ironbridge Global Partners, LLC in support of
petitioners.

*Kenneth B. Weckstein* and *Stephen A. Best* were on the brief
for *amicus curiae* Mark Cuban in support of petitioners.

*Mark B. Stern*, Attorney, U.S. Department of Justice, and *Dominick V. Freda*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for respondent. With them on the joint brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, *Beth S. Brinkmann*, Deputy Assistant Attorney General, *Mark R. Freeman*, *Melissa N. Patterson*, *Megan Barbero*, *Daniel J. Aguilar*, and *Tyce R. Walters*, Attorneys, *Michael A. Conley*, Solicitor, Securities and Exchange Commission, and *Martin V. Totaro*, Attorney.

Before: ROGERS, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Raymond J. Lucia and Raymond J. Lucia Companies, Inc., petition for review of the decision of the Securities and Exchange Commission imposing sanctions for violations of the Investment Advisers Act of 1940 and the rule against misleading advertising. Upon granting a petition for review of an initial decision by an administrative law judge ("ALJ"), the Commission rejected petitioners' challenges to the liability and sanctions determinations and petitioners' argument that the administrative hearing was an unconstitutional procedure because the administrative law judge who heard the enforcement action was unconstitutionally appointed. Petitioners now renew these arguments, including that the judge was a constitutional Officer who must be appointed pursuant to the Appointments Clause, U.S. CONST. art. II, § 2, cl. 2. For the following reasons, we deny the petition for review.

**I.**

In the Securities Exchange Act of 1934, Congress determined that transactions in securities conducted over

exchanges and over-the-counter markets were "affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto." 15 U.S.C. § 78b. To carry out the regulation of the securities markets, Congress established the Securities and Exchange Commission, to be composed of five commissioners appointed by the President with the advice and consent of the Senate. *Id.* § 78d(a). Over time Congress expanded the responsibilities of the Commission, and by 1960 it was administering six statutes, *see* 1962 U.S.C.C.A.N. 2150, 2156, including the Investment Advisers Act of 1940, 15 U.S.C. § 80b-21. In 1961, pursuant the Reorganization Act of 1949, Pub. L. No. 81-109, ch. 226, 63 Stat. 203 (now codified as amended at 5 U.S.C. §§ 901–912), the President sent Congress a proposal to allow the Commission to delegate some of its responsibilities to divisions and individuals within the Commission. *See* 1961 U.S.C.C.A.N. 1351, 1351–52. The proposal was designed to provide "for greater flexibility in the handling of the business before the Commission, permitting its disposition at different levels so as better to promote its efficient dispatch." *Id.* at 1351. Further, this ability to delegate tasks would "relieve the Commissioners from the necessity of dealing with many matters of lesser importance and thus conserve their time for the consideration of major matters of policy and planning." *Id.*

In response, Congress enacted "An Act to Authorize the Securities and Exchange Commission to Delegate Certain Functions," Pub. L. No. 87-592, 76 Stat. 394, 394–95 (1962). Congress made three main changes to the President's proposal: a single Commissioner's vote was sufficient to require Commission review, the authority to delegate did not extend to the Commission's rulemaking authority, and in certain instances review was mandatory for adversely affected parties in circumstances not at issue here. *Compare* 1961 U.S.C.C.A.N.

at 1352, *with* 76 Stat. at 394–95.  Except for modification of when Commission review is mandatory, *see* An Act to Amend the Securities and Exchange Act of 1934, Pub. L. No. 94-29, § 25, 89 Stat. 97, 163 (1975), and substitution of "administrative law judge" for "hearing examiner, *see* Pub. L. No. 95-251, § 2(a)(4), 92 Stat. 183, 183 (1978), the current version of the statute, codified at 15 U.S.C. § 78d-1, has not been amended in any material respect since its enactment in 1962, *see* Securities and Exchange Commission Authorization Act of 1987, Pub. L. No. 100-181, § 308, 101 Stat. 1249, 1254–55.

Section 78d-1 has three basic parts.  Subsection (a) provides that "the Securities and Exchange Commission shall have the authority to delegate, by published order or rule, any of its functions to a division of the Commission, an individual Commissioner, an [ALJ], or an employee or employee board, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter."  15 U.S.C. § 78d-1(a).  Subsection (b) provides that the "Commission shall retain a discretionary right to review the [delegated] action . . . upon its own initiative or upon petition of a party to or intervenor in such action."  *Id.* § 78d-1(b).  It also lists when Commission review of a petition is mandatory.  *Id.*  Subsection (c) provides:

> If the [Commission's] right to exercise such review is declined, or if no such review is sought within the time stated in the rules promulgated by the Commission, then the action of any such division of the Commission, individual Commissioner, [ALJ], employee, or employee board, shall, for all purposes, including appeal or review thereof, be deemed the action of the Commission.

*Id.* § 78d-1(c).

The Commission has authority to pursue alleged violators of the securities laws by filing a civil suit in the federal district court or by instituting a civil administrative action. *See* 15 U.S.C. §§ 78u, 78u-2, 78u-3, 78v; *see also id.* §§ 77h-1, 77t(b), 80b-9. By rule, the Commission has delegated to its ALJs authority to conduct administrative hearings, 17 C.F.R. § 200.30-9, and "[t]o make an initial decision in any proceeding at which the [ALJ] presides in which a hearing is required to be conducted in conformity with the [Administrative Procedure Act ("APA")] (5 U.S.C. 557)," *id.* § 200.30-9(a); *see id.* §§ 200.14, 201.111. The ALJs have authority to, among other things, administer oaths, issue subpoenas, rule on offers of proof, examine witnesses, rule upon motions, *id.* §§ 200.14, 201.111, enter orders of default, *see id.* § 201.155, and punish contemptuous conduct by excluding a contemptuous person from a hearing, *see id.* § 201.180(a); on the other hand, they lack authority to seek court enforcement of subpoenas and have no authority to punish disobedience of discovery orders or other orders with contempt sanctions of fine or imprisonment.

In any event, the Commission retains discretion to review an ALJ's initial decision either on its own initiative or upon a petition for review filed by a party or aggrieved person. 15 U.S.C. § 78d-1(b); *see also* 17 C.F.R. § 201.411(b)–(c). Other than where a petition for review triggers mandatory review, 15 U.S.C. § 78d-1(b); *see also* 17 C.F.R. § 201.411(b)(1), the Commission may deny review, 17 C.F.R. § 201.411(b)(2). By rule, the Commission has established time limits for filing a petition for review, *id.* §§ 201.360(b), 201.410(b), and, when no petition is filed, for ordering review on its own initiative, *id.* § 201.411(c). Further, by rule, the Commission has established a procedure for finalizing its decisions. *Id.* § 201.360(d). If no review of the initial decision is sought or ordered upon the Commission's own initiative, then the Commission will issue an order advising that it has declined review and specifying the

"date on which sanctions, if any, take effect"; notice of the order will be published in the Commission's docket and on its website. *Id*. § 201.360(d)(2). Thus, by rule, the initial "decision becomes final upon issuance of the order," *id.*, and then because review has been declined, by statute "the action of" the ALJ, in the initial decision, "shall . . . be deemed the action of the Commission." 15 U.S.C. § 78d-1(c).

Here, the Commission instituted an administrative enforcement action against petitioners for alleged violations of anti-fraud provisions of the Investment Advisers Act based on how they presented their "Buckets of Money" retirement wealth-management strategy to prospective clients.[1] It ordered an ALJ to conduct a public hearing, *Raymond J. Lucia Cos., Inc.*, Exchange Act Release No. 67781, 2012 WL 3838150 (Sep. 5, 2012), and thereafter an ALJ issued an initial decision finding liability based only on one of the four charged misrepresentations and imposing sanctions, including a lifetime industry bar of Raymond J. Lucia, *Raymond J. Lucia Cos., Inc.*, Initial Decision Release No. 495, 2013 WL 3379719 (July 8, 2013). A month later, the ALJ issued an order on petitioners' motion to correct manifest errors of fact. *Raymond J. Lucia Cos., Inc.*, Administrative Proceedings Rulings Release No. 780 (Aug. 7, 2013). The Commission, *sua sponte*, remanded the

---

[1] Sections 206(1), (2), and (4) of the Investment Advisors Act provides that an investment adviser may not (1) "employ any device, scheme, or artifice to defraud any . . . prospective client," (2) "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any . . . prospective client," or (4) "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(1), (2), (4). Under Commission Rule 206(4)-1(a)(5) an investment adviser may not "publish, circulate, or distribute any advertisement . . . [w]hich contains any untrue statement of a material fact, or which is otherwise false or misleading." 17 C.F.R. § 275.206(4)-1(a)(5).

case for further findings of fact on the three charges the ALJ had not addressed. The ALJ subsequently issued a revised initial decision. *Raymond J. Lucia Cos., Inc.*, Initial Decision Release No. 540, 2013 WL 6384274 (Dec. 6, 2013) ("initial decision"). Thereafter, the Commission granted petitioners' petition for review and the Enforcement Division's cross-petition for review.

"[O]n an independent review of the record," except as to unchallenged factual findings, the Commission found that petitioners committed anti-fraud violations and imposed the same sanctions as the ALJ. *Raymond J. Lucia Cos., Inc.*, Exchange Act Release No. 75837, at 3, 2015 WL 5172953 (Sept. 3, 2015) ("*Decision*"). The Commission also rejected petitioners' argument that the administrative proceeding was unconstitutional because the presiding ALJ was not appointed in accordance with the Appointments Clause under Article II, Section 2, Clause 2 of the Constitution. *Id.* at 28–33. Relying on *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000), the Commission concluded its ALJs are employees, not Officers, and their appointment is not covered by the Clause. *Decision* at 28–33.

## II.

Petitioners first contend that the Commission's decision and order under review should be vacated because the ALJ rendering the initial decision was a constitutional Officer who was not appointed pursuant to the Appointments Clause. Because the government does not maintain that the Commission's decision can be upheld if the presiding ALJ was unconstitutionally appointed, we address this issue first because were petitioners to prevail there would be no need to reach their challenges to the liability and sanction determinations. The Commission has acknowledged the ALJ was not appointed as the Clause requires,

and the government does not argue harmless error would apply. *See Ryder v. United States*, 515 U.S. 177, 186 (1995). Thus, if the court concludes, upon considering the constitutional issue *de novo*, *see J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041, 1044 (D.C. Cir. 2009), that Commission ALJs are Officers within the meaning of the Appointments Clause, then the ALJ in petitioners' case was unconstitutionally appointed and the court must grant the petition for review.

The Appointments Clause provides that the President:

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2, cl. 2. Unless provided for elsewhere in the Constitution, "all Officers of the United States are to be appointed in accordance with the Clause." *Buckley v. Valeo*, 424 U.S. 1, 132 (1976). This includes not only executive Officers, but judicial Officers and those of administrative agencies. *See id.* at 132–33. Only those deemed to be employees or other "'lesser functionaries' need not be selected in compliance with the strict requirements of Article II." *Freytag v. Comm'r, Internal Revenue*, 501 U.S. 868, 880 (1991) (quoting *Buckley*, 424 U.S. at 126 n.162). The Clause's limitations are not mere formalities, but have been understood to be "among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). The Clause addresses concerns about diffusion of the appointment power and ensures "that those who wielded it

were accountable to political force and the will of the people." *Freytag*, 501 U.S. at 883–84; *see also Ryder*, 515 U.S. at 182.

The Supreme Court has explained that generally an appointee is an Officer, and not an employee who falls beyond the reach of the Clause, if the appointee exercises "significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126. In that case, the Court held that insofar as the Federal Election Commission ("FEC") had rulemaking authority, primary responsibility for conducting civil litigation, and power to determine eligibility for federal matching funds and federal elective office, only "Officers of the United States" duly appointed in accordance with the Appointments Clause could exercise such powers because each represented "the performance of a significant governmental duty exercised pursuant to a public law"; the commissioners had not been appointed properly and therefore could not. *Buckley*, 424 U.S. at 140–41. So too, in *Freytag*, 501 U.S. 868, where the Court considered the powers and duties of special trial judges, *id.* at 882, who as members of an Article I court could exercise the judicial power of the United States, *id.* at 888–89, to be significant and explained that an appointee is no less an Officer because some of his duties are those of an employee. For that reason, when evaluating whether an appointee is a constitutional Officer, a reviewing court will look not only to the authority exercised in a petitioner's case but to all of that appointee's duties, or at least those called to the court's attention. *See Tucker v. Comm'r, Internal Revenue*, 676 F.3d 1129, 1132 (D.C. Cir. 2012) (citing *Freytag*, 501 U.S. at 882); *Landry*, 204 F.3d at 1131–32.

This court has elaborated on what constitutes an exercise of "significant authority." Once the appointee meets the threshold requirement that the relevant position was "established by Law" and the position's "duties, salary, and means of appointment"

are specified by statute, *Landry*, 204 F.3d at 1133–34 (quoting *Freytag*, 501 U.S. at 881), "the main criteria for drawing the line between inferior Officers and employees not covered by the Clause are (1) the significance of the matters resolved by the officials, (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions," *Tucker*, 676 F.3d at 1133; *see Landry*, 204 F.3d at 1133–34.  In *Landry*, 204 F.3d at 1134, the court held that the ALJs of the Federal Deposit Insurance Corporation ("FDIC") were not Officers because they did not satisfy the third criterion; unlike the special tax judges in *Freytag*, the FDIC ALJs could not issue final decisions because their authority was limited by FDIC regulations to recommending decisions that the FDIC Board of Directors might issue, *id.* at 1133 (citing 12 C.F.R. § 308.38).  This court understood that it "was critical to the Court's decision" in *Freytag* that the special trial judge had authority to issue final decisions in at least some cases, because it would have been "unnecessary" for the Court to consider whether the tax judges had final decision-making power when the judge in Freytag's case exercised no such power.  *Id.* (citing *Freytag*, 501 U.S. at 882).  Similarly, in *Tucker*, 676 F.3d at 1134, the court held that an employee of the IRS Office of Appeals was not an Officer because regulatory and other constraints — such as detailed guidelines, consultation requirements, and supervision — meant that Appeals employees lacked the discretion required by the second criterion.  In both cases, either due to the lack of final decision power or discretion, the appointee could not be said to have been delegated sovereign authority or to have the power to bind third parties, or the government itself, for the public benefit.  *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 87 (2007).

*Landry*, of course, did not resolve the constitutional status of ALJs for all agencies.  *See Landry,* 204 F.3d at 1133–34; *see also Free Enterprise Fund v. Public Co. Accounting Oversight*

*Bd.*, 561 U.S. 477, 507 n.10 (2010). But to the extent petitioners contend that the approach required by *Landry* is inconsistent with *Freytag* or other Supreme Court precedent, this court has rejected that argument and *Landry* is the law of the circuit, *see LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996). For the same reason, the court must reject petitioners' view, relying on *Edmond*, that the ability to "render a final decision on behalf of the United States," while having a bearing on the dividing line between principal and inferior Officers, is irrelevant to the distinction between inferior Officers and employees. Petrs. Br. 25 (quoting *Edmond*, 520 U.S. at 665–66). Moreover, in *Edmond*, 520 U.S. at 656, the Court noted that the government did not dispute that military court appellate judges were Officers and addressed only what type of Officer they were; it had no occasion to address the differences between employees and Officers.

As to the petitioners' contentions about *Landry*'s application to Commission ALJs, the parties principally disagree about whether Commission ALJs issue final decisions of the Commission. Our analysis begins, and ends, there.

Petitioners emphasize the requirement in section 78d-1(c) that the ALJ's "action," when not reviewed by the Commission, "*shall*, for all purposes, including appeal or review thereof, *be deemed* the action of the Commission." (emphasis as added in Petrs. Br. 36). In their view, the statute contemplates that the ALJ's initial decision becomes final in at least some circumstances when Commission review is declined. "At a minimum," they suggest, "Congress has indisputably *permitted* the [Commission] to treat unappealed ALJ decisions as final." Petrs. Br. 36–37.

The government acknowledges that the statute might have permitted this approach, but emphasizes that subsection (c) of

the statute cannot be looked at in isolation because the same statutory provision on which petitioners rely also authorizes the Commission to establish its delegation and review scheme by rule. 15 U.S.C. § 78d-1(a)–(b). There can be no serious question that Section 78d-1(b) reserves to the Commission "a discretionary right to review the action of any" ALJ as it sees fit. And the Commission promulgated rules to govern that review pursuant to its general rulemaking authority under the security laws. *See Decision* at 31 n.109 (citing 17 C.F.R. § 201.360(d)(2)); *see also* 15 U.S.C. § 78w(a)(1). For the purposes of the Appointments Clause, the Commission's regulations on the scope of its ALJ's authority are no less controlling than the FDIC regulations to which this court looked in *Landry*, 204 F.3d at 1133 (citing 12 C.F.R. §§ 308.38, 308.40(a), (c)).

So understood, the Commission *could* have chosen to adopt regulations whereby an ALJ's initial decision would be deemed a final decision of the Commission upon the expiration of a review period, without any additional Commission action. But that is not what the Commission has done. Instead, by rule the Commission, as relevant, has defined when its "right to exercise [Section 78d-1(b)] review is declined" and has established the process by which an initial decision can become final and thereby "be deemed the action of the Commission," 15 U.S.C. § 78d-1(c). First, it has afforded itself additional time to determine whether it wishes to order review even when no petition for review is filed. 17 C.F.R. § 201.411(c). Second, upon deciding not to order review, the Commission issues an order stating that it has decided not to review the initial decision and setting the date when the sanctions, if any, take effect. *Id*. § 201.360(d)(2).

Although petitioners maintain that the finality order cannot transform the ALJ's initial decision into a mere recommendation

because the "confirmatory order is a ministerial formality, akin to a court clerk's automatic issuance of the mandate after the time for seeking appellate review has expired," Petrs. Br. 36, the Commission has explained that the order plays a more critical role. Until the Commission determines not to order review, within the time allowed by its rules, *see e.g.*, 17 C.F.R. §§ 201.360(d)(2), 201.411(c), there is no final decision that can "be deemed the action of the Commission," 15 U.S.C. § 78d-1(c). As the Commission has emphasized, the initial decision becomes final when, and only when, the Commission issues the finality order, and not before then. *See Decision* at 31. Thus, the Commission must affirmatively act — by issuing the order — in every case. The Commission's final action is either in the form of a new decision after *de novo* review or, by declining to grant or order review, its embrace of the ALJ's initial decision as its own. In either event, the Commission has retained full decision-making powers, and the mere passage of time is not enough to establish finality. And even when there is not full review by the Commission, it is the act of issuing the finality order that makes the initial decision the action of the Commission within the meaning of the delegation statute. Indeed, as this court observed in *Jarkesy v. SEC*, 803 F.3d 9, 12–13 (D.C. Cir. 2015) (citing 17 C.F.R. §§ 201.360(d)(2), 201.411(a)), in holding that exhaustion of constitutional issues was required, the Commission alone issues final orders.

Put otherwise, the Commission's ALJs neither have been delegated sovereign authority to act independently of the Commission nor, by other means established by Congress, do they have the power to bind third parties, or the government itself, for the public benefit. *See* 31 Op. OLC at 87. The Commission's right of discretionary review under Section 78d-1(b) and adoption of its regulatory scheme for delegation pursuant to Section 78d-1(c) ensure that the politically accountable Commissioners have determined that an ALJ's

initial decision is to be the final action of the Commission.

Petitioners object generally to this understanding of the Commission's delegation scheme, but it cannot seriously be argued that the Commission's regulatory scheme is not a reasonable interpretation of the statute, specifically defining the circumstances under which its "right to exercise . . . review is declined," 15 U.S.C. § 78d-1(c), and that the Commission's interpretation of the finality order is a reasonable interpretation of its regulations. *See Christopher SmithKline Beecham Corp.*, 132 S. Ct. 156, 2165–66 (2012). Further, nothing in the legislative history of Section 78d-1, the regulatory history of 17 C.F.R. § 201.360(d), or Commission precedent indicates Congress or the Commission intended that the ALJ who presides at an enforcement proceedings be delegated the sovereign power of the Commission to make the final decision. This is consistent with Congress's adoption of the President's reorganization proposal to provide "for greater flexibility in the handling of the business before the Commission," and "relieve the Commissioners from the necessity of dealing with many matters of lesser importance and thus conserve their time for the consideration of major matters of policy and planning." 1961 U.S.C.C.A.N. at 1351. The history of the Commission's finality regulation, 17 C.F.R. § 201.360(d)(2), demonstrates that the finality order was and remains an after-the-fact statement to the parties that the Commission has declined to order review. *See* 17 C.F.R. § 201.360(d)(1) (1995); Proposed Amendments to the Rules of Practice and Related Provisions, Exchange Act Release No. 34-48832, 2003 WL 22827684, at *12 (Nov. 23, 2003). And the Commission's precedent in *Alchemy Ventures, Inc.*, Release No. 70708, 2013 WL 6173809 (Oct. 17, 2013); *see* Petrs. Br. 32 n.5, resolved an ambiguity, ruling that even in cases of defaults ALJs must issue initial decisions as required by Commission rules; it left enforceable outstanding default orders but made clear that ALJs do not have authority to proceed

without issuing initial decisions. *Id*. at \*2–4 (citing17 C.F.R. § 201.360(d)).

Because the Commission has reasonably interpreted its regulatory regime to mean that no initial decision of its ALJs is independently final, such initial decisions are no more final than the recommended decisions issued by FDIC ALJs. This is so even though the FDIC's regulations limit its ALJs to issuing "recommended decisions" and require the FDIC to consider and decide every case, whereas the Commission can choose not to order or grant full review of a case. Based on the Commission's interpretation of its delegation scheme, the difference between the FDIC's recommended decisions and the Commission's initial decisions is "illusory." Resp't. Br. 28. As discussed, the Commission can always grant review on its own initiative, and so it must consider every initial decision, including those in which it does not order review. 15 U.S.C. § 78d-1(b); 17 C.F.R. §§ 201.360(d)(2), 201.411(c). It gives itself time to decide whether to order review and must always issue a finality order to indicate whether it has declined review. 17 C.F.R. §§ 201.360(d)(2), 201.411(c). Petitioners offer neither reason to understand the finality order to be merely a rubber stamp, nor evidence that initial decisions of which the Commission does not order full review receive no substantive consideration as part of this process. That is, petitioners have not substantiated that a finality order is just like a clerk automatically issuing a mandate, Petrs. Br. 36, and, in so asserting, have ignored that clerks have no authority to review orders or decline to issue mandates. It is also worth noting that the differences between the two regimes are not as stark as petitioners suggest. In either the FDIC or Commission system, issues of law and fact can go unreviewed; the FDIC's regulations do not require the Board to consider issues of fact and law unless a party raises the issue before the Board (after having raised it before an ALJ), *see* 12 C.F.R. § 308.40(c)(1); *see also id.* § 308.39(b)(2).

16

In a further attempt to distinguish the FDIC regime considered in *Landry*, petitioners contend that even if Commission ALJs do not issue final decisions, they still exercise greater authority than FDIC ALJs in view of differences in the scope of review of the ALJ's decisions. But the Commission's scope of review is no more deferential than that of the FDIC Board. It reviews an ALJ's decision *de novo* and "may affirm, reverse, modify, [or] set aside" the initial decision, "in whole or in part," and it "may make any findings or conclusions that in its judgment are proper and on the basis of the record." 17 C.F.R. § 201.411(a). It "ultimately controls the record for review and decides what is in the record." *Decision* at 31. It may "remand for further proceedings," 17 C.F.R. § 201.411(a), as it did in petitioners' case, "remand . . . for the taking of additional evidence," or "hear additional evidence" itself. *Id.* § 201.452. Furthermore, if "a majority of participating Commissioners do not agree to a disposition on the merits, the initial decision shall be of no effect." *Id.* § 201.411(f). To the same extent the Commission may sometimes defer to the credibility determinations of its ALJs, *see, e.g.*, *Clawson*, Exchange Act Release No. 48143, 2003 WL 21539920, at *2 (July 9, 2003), so too may the FDIC, *see Landry*, 1999 WL 440608, at *23 (May 25, 1999). The FDIC and the Commission may defer to credibility determinations where the record provides no basis for disturbing the finding, but an agency is not required to adopt the credibility determinations of an ALJ, *see Kay v. FCC*, 396 F.3d 1184, 1189 (D.C. Cir. 2005) (citing 5 U.S.C. § 557(b)). By contrast, the Tax Court in *Freytag* was "required to defer" to the special trial judge's "factual and credibility findings unless they were clearly erroneous," *Landry*, 204 F.3d at 1133. Petitioners' reliance on 17 C.F.R. § 201.411(b)(2)(ii)(A) is misplaced; that rule refers to the criteria the Commission considers in deciding whether to grant a petition for review, not the subsequent proceedings, *see* 17 C.F.R. § 201.411(a), and not the Commission's determination of whether to order *sua sponte*

review, *see id.* § 201.411(c).

Contrary to petitioners' suggestion, the Commission's treatment of a Commission ALJ's initial decision is not inconsistent with the treatment given to initial decisions in the APA, which provides where an agency does not exercise its authority of review, the ALJ's initial decision "becomes the decision of the agency without further proceedings." 5 U.S.C. § 557(b); *see also* U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 82–83 (1947). As discussed, an initial decision is "deemed to be the decision of the Commission" but only after that decision has been embraced by the Commissioners as their own. Even though the APA may permit agencies to establish different processes, whereby an ALJ's initial decision can become final and binding on third parties, the Commission was not required to do so. Congress considered and rejected proposals to transfer final decision-making authority from agency officials to presidentially appointed judges in a separate administrative court with powers similar to those generally vested in Article I courts. *See* H.R. Rep. No. 79-1980, at 8 (1946), *reprinted in Legislative History of Administrative Procedure Act*, at 242 (1946). It determined hearing examiners (now ALJs) should continue to be located within each agency and should have independence within the Civil Service System with regard to tenure and compensation. *See Ramspeck v. Federal Trial Exam'rs Conference*, 345 U.S. 128, 132 & n.2 (1953). But that independence did not mean they were unaccountable to the agency for which they are working. The *Attorney General's Manual on the Administrative Procedure Act* 83*,* explained Congress envisioned that notwithstanding an ALJ's initial decision, the agency could retain "complete freedom of decision." As a contemporaneous interpretation, the Manual is given "considerable weight." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (quoting *Pacific Gas & Elec. Co. v. FPC*, 506

F.2d 33, 38 n.17 (D.C. Cir. 1974) (noting active role played by the Attorney General in the formation and implementation of the APA)). The APA provides, thus, that on appeal from or review of the initial decision, the agency "has all the powers which it would have in making the initial decision," and even on questions of fact, *Kay*, 396 F.3d at 1189 (quoting 5 U.S.C. § 557), "an agency reviewing an ALJ decision is not in a position analogous to a court of appeals reviewing a case tried to a district court," *id.* In this way, Congress left to the agency the flexibility to have final authority in agency proceedings while providing Civil Service protections to ALJs in response to concerns their actions were influenced by a desire to curry favor with agency heads. *See Ramspeck*, 345 U.S. at 132 & n.3, 142.

Finally, petitioners point to nothing in the securities laws that suggests Congress intended that Commission ALJs be appointed as if Officers. They do point to the reference to "officers of the Commission" in 15 U.S.C. § 77u, but there is no indication Congress intended these officers to be synonymous with "Officers of the United States" under the Appointments Clause. Of course, petitioners contend that Congress was constitutionally required to make the Commission ALJs inferior Officers based on the duties they perform. But having failed to demonstrate that Commission ALJs perform such duties as would invoke that requirement, this court could not cast aside a carefully devised scheme established after years of legislative consideration and agency implementation. *See* 5 U.S.C. §§ 3105, 3313; *see also* Civil Service Reform Act of 1978, Pub. L. 95-454, 92 Stat. 1111.

## III.

We turn, then, to petitioners' challenges to the Commission's liability findings and its choice of sanction, principally on the ground that punishment is being imposed for

conduct that was not unlawful at the time it occurred. They view the Enforcement Division's "entire case" to have been that petitioners misled investors by describing their presentation of how their "Buckets-of-Money" strategy would have performed historically as a "backtest" even though it was not based only on historical data and instead utilized a mix of historical data and assumptions. Petrs. Br. 45. In their view, the presentation set forth all of the assumptions that went into their backtests and so could not have been understood to have relied only on historical data.

**A.**

The question for the court is whether there was substantial evidence to support the Commission's determination that, by touting their investment strategy through the false promise of "backtested" historical success, petitioners violated the antifraud provisions of the Investment Advisers Act. *See Koch v. SEC*, 793 F.3d 147, 151–52 (D.C. Cir. 2015) (quoting 15 U.S.C. §§ 78y(a)(4), 80b-13(a)); *Kornman v. SEC*, 592 F.3d 173, 184 (D.C. Cir. 2010). Our review is deferential. Substantial evidence means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Koch*, 793 F.3d at 151–52 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). The Commission's "conclusions may be set aside only if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 152 (quoting *Graham v. SEC*, 222 F.3d 994, 999–1000 (D.C. Cir. 2000)); *see also Rapoport v. SEC*, 682 F.3d 98, 103 (D.C. Cir. 2012).

The Commission found that petitioners had violated the Investment Advisers Act, *see supra* note 1, as a result of factual misrepresentations they made in their presentations at free retirement-planning seminars. During these presentations, petitioners advocated a "Buckets-of-Money" investment strategy, which called for spreading investments among several

types of assets that vary in degrees of risk and liquidity. The core benefit of the strategy, petitioners claimed, was that prospective clients could live comfortably off of their investment income while also leaving a large inheritance. During nearly forty seminars, petitioners used a slideshow to illustrate how this strategy would have performed relative to other common investment strategies. Rather than present a purely hypothetical example about how the strategy might perform, petitioners illustrated how the investment strategy would have performed for a fictional couple retiring during the historic economic downturns in the "1973/74 Grizzly Bear" market and in 1966. Each example showed that a couple using the "Buckets-of-Money" strategy would have increased the value of their investments despite the market downturns and would have done much better than those utilizing other investment strategies.

To find violations of Sections 206(1), (2), and (4) of the Investment Advisers Act, the Commission required evidence from which it could find that petitioners made statements that were misleading either because they misstated a fact or omitted a fact necessary to clarify the statement, and that those misstatements or omissions were material. *Decision* at 17; 15 U.S.C. § 80b-6(1), (2), (4). In addition, for a violation of Section 206(1), the Commission needed evidence that those statements were made with scienter. *Decision* at 17.

The Commission found that petitioners' "Buckets-of-Money" presentation was misleading for three reasons:

1. Petitioners misled prospective investors by stating that they were backtesting the "Buckets-of-Money" investment strategy. *Decision* at 17–18. The actual testing had not used only historical data and instead relied on a mix of historical data and assumptions about the inflation rate and the rate of return on

one type of asset on which the strategy relied, Real Estate Investment Trusts ("REITs"). *Id.* at 17–18, 23–26. Petitioners presented their investment strategy as so effective that it would have weathered historical periods of market volatility, and nowhere suggested that they were presenting mere abstract hypotheticals. In that context, stating as "backtest" results figures that did not rely exclusively on historical data was misleading. *Id.* In addition, petitioners should not have been able to say that they backtested the "Buckets-of-Money" investment strategy when they had failed to implement what petitioners had described as a key part of the strategy: shifting (or "rebucketizing") assets from the riskiest buckets of assets to safer buckets of assets once assets in the safest buckets were spent. *Id.* at 18–19, 25. This "rebucketizing" ensured that prospective investors would never have all of their assets in the riskiest bucket.

       2.    Petitioners misled prospective investors by presenting the *results* that they featured in their presentations. *Id.* at 18. Petitioners represented that individuals using their "Buckets-of-Money" investment strategy starting in 1966 or 1973 would have seen the value of their investments increase. This result was based on flawed assumptions because petitioners underestimated the effect of inflation and overestimated the expected REIT returns, thereby dramatically departing from historical reality. *See id.* Further, the failure to "rebucketize" meant that the presented result was based on an artificially high percentage of assets in stocks during the time the stock market happened to be performing well. *Id.* at 18–19. Had petitioners utilized more realistic estimates and "rebucketized," as they insisted their strategy required, they would have had to show that the "Buckets-of-Money" investment strategy had run out of assets rather than grown as advertised. *Id.* at 18.

3. Petitioners' stated result of the 1973 backtest was misleading because, even using their assumptions, the result could not be replicated and because petitioners failed to provide any documentary support for the result they presented to prospective clients. *Id.* at 17, 19. Thus, petitioners "either fabricated the 1973 backtest result or presented it to seminar attendees without ensuring its accuracy." *Id.* at 19.

The Commission also found that these misrepresentations were material because they would have been significant to a reasonable investor in determining whether to adopt the "Buckets-of-Money" investment strategy. *Id.* at 19 & n.63 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). In support, the Commission referenced testimony from potential investors who were present during some of the presentations. Further, because petitioners designed the slides and would have been aware of the risk of misleading prospective clients as a result of their misrepresentations, the Commission found that petitioners acted with scienter because they had been at least reckless in presenting the backtest slides. *Id.* at 19–20.

Petitioners challenge all three bases for the Commission's determination that the slides were misleading as well as the materiality of the misstatement of the 1973 results and the finding of scienter. When viewed in the context of the presentation, as a whole, petitioners maintain that there was not substantial evidence to support the Commission's finding that they misled prospective clients by stating that they had backtested the "Buckets-of-Money" investment strategy. Rather, they claim, the absence of any settled meaning of the term "backtest" meant that their use of the term, standing alone, did not necessarily imply that the "backtest" analysis would use only historical data. Such an implication was all the more remarkable, in petitioners' view, given the disclaimers on their slides stating that this particular backtest would utilize some

hypothetical assumptions. Further, in their view, it was not misleading to state they had backtested the "Buckets-of-Money" investment strategy even if they had not "rebucketized" the assets in the way initially described in the strategy. Although petitioners acknowledge that they referenced "rebucketizing" in the slides, their view is that there was no evidence that "rebucketizing" was a necessary — as opposed to an optional and more advanced — component of the "Buckets-of-Money" investment strategy.

There is substantial evidence to support the Commission's finding that petitioners' "Buckets-of-Money" presentation promised to provide an historical-data-only backtest where the analysis would account for "rebucketizing." As the Commission found, experts for petitioners and the government agreed that the term backtest typically referred to the use of historical, not assumed, data. *Id.* at 17. The Commission emphasized that petitioners "introduced no expert testimony to establish industry practice, and their own inflation and REIT experts agreed that backtests use historical rates." *Id.* at 26. The Commission accorded little weight to a single mutual fund promotional brochure emphasized by petitioners because, although the brochure used the term backtest in connection with an assumed inflation rate, two other brochures used historical rates in connection with their backtests. *Id.*

Furthermore, the Commission did not rest its analysis exclusively on petitioners' use of the word "backtest" or the Commission's understanding that the term meant an historical-data-only analysis. In response to petitioners' argument that it would be unfair for the Commission to apply a newly established definition to find petitioners conduct unlawful, the Commission explained that it was not attempting to define "backtest" for all purposes. *Id.* at 25. Rather, what was misleading was the statement to seminar attendees that

petitioners had analyzed how the "Buckets-of-Money" investment strategy would have performed in the past. *Id.* That is, not only had petitioners used the word "backtest" in their presentations, they had also introduced both historical illustrations (1973 and 1966) by asking what would have happened had a couple used the "Buckets-of-Money" investment strategy at these times. To answer accurately how the strategy would have performed historically would require the use of historical data. Thus, it was misleading for petitioners not to inform seminar attendees that petitioners' backtest could not accurately answer that question. *Id.* And for that reason, even though the presentation contained disclaimers that some assumptions would be used in the historical backtests, the Commission concluded that petitioners had not altered "the overall impression that [they] had performed backtests showing how the ["Buckets-of-Money" investment] strategy would have performed during the two historical periods." *Id.* at 23.

Petitioners likewise fail to undermine the Commission's finding that a slide purporting to backtest the "Buckets-of-Money" investment strategy would be understood by a reasonable investor to include "rebucketizing" of assets. *Id.* at 25. Contrary to the government's suggestion, petitioners did argue to the Commission that "rebucketizing" was not an essential part of the "Buckets-of-Money" investment strategy, *see* Petrs. Br. to Comm'n 14–15 (2014). The Commission rejected that argument and substantial evidence supports its finding that "rebucketizing" was an essential part of the "Buckets-of-Money" investment strategy so that any purported backtest of that strategy would imply that "rebucketizing" was taking place. Raymond J. Lucia acknowledged that an investor should never have one-hundred percent of his assets in stocks, and made related statements that an investor should not draw income directly from his stock portfolio, both of which would have been necessary over the period of the backtests absent

"rebucketizing." *Decision* at 14. Further, when petitioners first introduced the "Buckets-of-Money" investment strategy in their presentation, a slide stated that "rebucketizing" would take place after the non-stock income buckets were exhausted as funds were used for living expenses. Because petitioners never made clear in their presentations that the historical analyses did not include "rebucketizing," and there is no evidence that the backtest must have been understood not to include "rebucketizing," the Commission's finding that "rebucketizing" was essential is supported by substantial evidence in the record.

Petitioners also fail to show that the Commission erred in finding that it was misleading for them to present results that overstated how the "Buckets-of-Money" investment strategy would have performed historically. *Id.* at 18. As the Commission found, petitioners' assumed inflation and REIT rates were [flawed] and had the effect of dramatically overstating the results of the historical analysis. *Id.* at 18–19. For example, the use of a flat 3% inflation rate understated the effect of inflation when the actual inflation rate reached double digits in the late 1970s and early 1980s. *Id.* at 18. Also, the failure to "rebucketize" had the effect of overstating gains. *Id.* at 18–19. Petitioners attempt to justify the use of assumptions generally, referencing the disclaimers in the slides, but nowhere maintain that the assumptions they chose could be expected to produce results that approximated historic performance. *Id.*

Petitioners take another tack in challenging the Commission's finding that using petitioners' flawed assumptions would not produce the 1973 backtest result represented in the slides. Here, they principally maintain that the Commission never charged the error in the 1973 backtest result and that they therefore had no notice that the erroneous result was under scrutiny. In fact, the charging document provided adequate notice. Incorporating the facts underlying the

alleged violations, the charging document alleged that petitioners "failed to keep adequate records" and that the spreadsheet records they maintained failed to "duplicate the advertised investment strategy." *Raymond J. Lucia Cos., Inc.*, Exchange Act Release No. 67781, at 9. The Commission's finding that the 1973 backtest result was either "fabricated" or inaccurate was an outgrowth of this charge as it became clear there was no documentary proof of the presented 1973 backtest result. *Decision* at 8, 19. Petitioners admitted during the hearing that the spreadsheets they produced to substantiate the result were not actually used and included different assumptions than were relied upon in the 1973 backtest shown to potential investors. *Id.* They also admitted that the assumptions presented in the slides could not be used to generate documentary proof of the 1973 result because they had used a different set of assumptions. *Id.* Further, petitioners' expert repeated the analysis with this different set of assumptions and still was unable to replicate the 1973 result. *Id.* The Commission's finding that it was misleading for petitioners to present a result for which they had no support, particularly when the result overstated the success of the "Buckets-of-Money" investment strategy, is supported by substantial evidence.

Petitioners' challenge to the Commission's finding that the misstatement about the 1973 backtest result was material is no more persuasive. A statement is "material" so long as there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.* 426 U.S. 438, 449 (1976)). Petitioners suggest that the misrepresentation could not have been material because the 1973 result presented in the slide understated the success of using the "Buckets-of-Money" investment strategy. But this suggestion rests solely on the 1973

backtest result spreadsheet, which petitioners admitted did not serve as the basis for the 1973 backtest analysis shown in the presentation. Further, petitioners' experts provided substantial evidence to support the Commission's finding that the slides overstated the 1973 backtest result. *Id.* at 19. The Commission had ample grounds to conclude that the reasonable investor would want to know that petitioners lacked documentary support for the number presented.

Finally, petitioners challenge the Commission's scienter finding. Under section 206(1), which prohibits an investment adviser from employing "any device, scheme, or artifice to defraud any client or prospective client," 15 U.S.C. § 80b-6(1), the Commission must find that petitioners acted with an "intent to deceive, manipulate, or defraud." *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). "[E]xtreme recklessness may also satisfy this intent requirement." *Id.* This is "not merely a heightened form of ordinary negligence" but "an 'extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* at 641–42 (quoting *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

To the extent petitioners maintain the Commission could not have found that they acted with scienter by misleadingly using the term "backtest" because the term did not have a settled meaning at the time, they misunderstand the basis of the Commission's scienter determination. The finding of recklessness did not focus only on petitioners' use of the term, but also focused on petitioners' presentation of slides that promised an historically accurate view of how the "Buckets-of-Money" investment strategy would have performed during periods of historic economic downturns. Petitioners' effort to

read ambiguity into the term "backtest" misses the key point: Whether they referred to their examples as "historical views," "retrospective applications," or "backtests," the misleading impression is the same. For that reason, the Commission found that petitioners either "knew or must have known of the risk of misleading prospective clients to believe that [petitioners] had performed actual backtests." *Decision* at 20. Because they knew historical inflation rates were higher than their assumed rate, that a key asset (REITs) did not perform as assumed, and that not "rebucketizing" would lead to higher returns, petitioners faced an obvious risk of presenting misleading results. *See id.*

There is no record support for petitioners' objection that the Commission could not have found scienter because they sought advance approval of their slides by the Commission as well as by two FINRA-registered broker-dealers. They offer no record basis to undermine the Commission's finding that there was no evidence petitioners had flagged the backtest slides for review or had provided the materials necessary to engage in meaningful review. *See id.* at 27–28. Petitioners ignore the Commission's reliance on a December 12, 2003, letter from Commission staff stating that petitioners "should not assume that [the] activities not discussed in this letter are in full compliance with the federal securities law." *Id*. at 28. The record thus does not show that petitioners took good-faith steps to seek advance approval of the statements that the Commission found they must have known to be misleading.

**B.**

The court's review of petitioners' challenge to the Commission's choice of sanctions is especially deferential. Because Congress has entrusted to the Commissioners' expertise the responsibility to select the means of achieving the statutory policy in relation to the appropriate remedy, their judgment regarding sanctions is "entitled to the greatest weight."

*Kornman*, 592 F.3d at 186 (quoting *Am. Power & Light v. SEC*, 329 U.S. 90, 112 (1946)).  The Commission must explain its reasons for selecting a particular sanction but it is not required to follow "any mechanistic formula."  *See id.* (citing *PAZ Sec., Inc. v. SEC*, 566 F.3d 1172, 1175 (D.C. Cir. 2009)).  The court will intervene "only if the remedy chosen is unwarranted in law or is without justification in fact."  *Id.* (quoting *Am. Power & Light*, 329 U.S. at 112–13).

The only sanction petitioners challenge is the imposition of the lifetime industry bar on Raymond J. Lucia, and that challenge is unpersuasive.  The Commission adequately explained the reasons for concluding that it was in the public interest to bar him from associating with an investment advisor, broker, or dealer under the Investment Advisers Act, *see* 15 U.S.C. § 80b-3(f).  Upon applying the factors set forth in *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), the Commission concluded that a bar was necessary to "protect[] the trading public from further harm," having found that his misconduct was egregious and recurrent, *Decision* at 34–35 (citation omitted).  He violated a fiduciary duty he owed to his prospective clients and did so repeatedly over the course of dozens of seminars.  *Id.* at 35.  He acted with a "high degree of scienter because he knowingly or recklessly misled prospective clients for the purpose of increasing [the corporation's] client base and fees generated therefrom."  *Id.*  Further, such behavior could be expected in the future because he had violated his fiduciary duties and failed to recognize the wrongful nature of his conduct.  *Id.*  In the Commission's view, the steps he had taken — such as selling his assets in the corporation and withdrawing its investment advisor registration — were insufficient to show that he would not engage in similar misconduct in the future.  *Id.* at 35–36.  He was still seeking to serve as an on-demand public speaker, consultant, and media personality on retirement planning and other topics.  *See id.* at

35–36 & n.132. Although acknowledging that he had stopped presenting the fraudulent backtest slides once the Commission informed him in 2010 of problems with the presentation and that he did not presently threaten to associate with an investment adviser, the Commission considered that these factors were outweighed by his recurrent and intentional misconduct and the "reasonable likelihood that, without a bar, [he] will again threaten the public interest by reassociating with an investment advisor, broker, or dealer." *Id.* at 35–36.

The Commission was unpersuaded that the evidence offered in mitigation lessened the gravity of his conduct or made it less likely that he would engage in such conduct in the future. *Id.* at 36–38. In its view, neither the possible financial losses he would suffer as a result of the permanent industry bar nor the absence of prior misconduct during forty years of working in the industry made his misconduct any less grave. "Here," the Commission concluded, "even without investor injury as an aggravating factor, [his] misconduct was egregious and a bar is in the public interest" inasmuch as its "public interest analysis focuses on the welfare of investors generally and the threat one poses to investors and the markets in the future." *Id.* at 37 (internal citation and alteration omitted). With respect to the request for an alternative sanction of censure and monitoring, the Commission noted that it had no obligation to impose sanctions similar to those imposed in settled proceedings, where "the avoidance of time-and-manpower-consuming adversary proceedings[] justif[ied] accepting lesser remedies in settlement," *id.* at 38, and emphasized that the appropriate remedy "depends on the facts and circumstances presented" in each case, *see id.*

The record is thus contrary to petitioners' position that the Commission abused its discretion by failing to offer a sufficient justification for imposing the lifetime industry bar. *See*

*Kornman*, 592 F.3d at 188; *see also Seghers v. SEC*, 548 F.3d 129, 135–36 (D.C. Cir. 2008). Undoubtedly the lifetime bar is a most serious sanction, *see Saad v. SEC*, 718 F.3d 904, 906 (D.C. Cir. 2013), and, in petitioners' view, more serious than the sanctions imposed for similar conduct in settled cases, *see* Petrs. Br. 61. The court, however, will not intervene simply because the Commission exercised its "discretion to impose a lesser sanction" in other cases, *see Kornman*, 592 F.3d at 186–88, for the "'Commission is not obligated to make its sanctions uniform,' and the court 'will not compare this sanction to those imposed in previous cases,'" *id.* at 188 (quoting *Geiger v. SEC*, 363 F.3d 481, 488 (D.C. Cir. 2004)); *see also Seghers*, 548 F.3d at 135. Indeed, the court has stated more broadly, that the Commission need not choose "the least onerous of the sanctions." *PAZ Sec.*, 566 F.3d at 1176. Here, the Commission considered the proposed alternative sanctions and determined, in its judgment, that they would not have been sufficient to protect investors. *Decision* at 37–38. In view of the Commission's findings that he repeatedly and recklessly engaged in egregious conduct without regard to his fiduciary duty to his clients, petitioners fail to show that the Commission's sanction was unwarranted as a matter of policy or without justification in fact, or that it failed to consider adequately his evidence of mitigation.

Accordingly, we deny the petition for review.