BRISCOE, Circuit Judge,
concurring.
I write not to differ with the rationale of the majority opinion, but rather to fully join it. My focus here is on the dissent. I group my concerns in two categories: (I) the dissent’s predictions about speculative “repercussions” of the opinion, by which it reaches what appear to be several erroneous conclusions; and (II) its application of a truncated legal framework to a misstated version of the facts of record.
I
Underlying the dissent’s position is a concern about the next case, and the one after that. The dissent suggests that a “probable consequence[ ]” of the opinion is that “all” 1,792 “federal ALJs are at risk of being declared inferior Officers.” Dissent at 1199 & n.5. But this was no less true when Freytag v. Commissioner of Internal Revenue was decided. 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). A “risk” always exists that a court will be called on to decide whether any particular federal employee or group of employees has been delegated sufficient authority to fall within the ambit of the Appointments Clause, U.S. Const, art. II, § 2, cl. 2, the Constitution’s structural safeguard tethering key personnel—Officers—to the sovereign power of the United States, and thus to the people. Answering that question in the, affirmative as to the SEC’s five ALJs does no “mischief’ to bedrock principles of constitutional law. Dissent at 1201.
Further, the majority has not affected “thousands of administrative actions,” id. at 1199, by answering that question. Frey *1189 tag instead commands that courts engage in a case-by-case analysis. 501 U.S. at 880-82, 111 S.Ct. 2681. Specifically, a court must determine whether a federal employee (or class of employees) is subject to the Appointments Clause by answering whether the employee exercises “significant authority pursuant to the laws of the United States,” and, in turn,, by analyzing the aggregate “duties and functions” the employee performs or is authorized to perform. Id. at 881, 111 S.Ct. 2631 (quotation marks and citations omitted). That power sometimes comes in the form of final decision-making authority, id. at 882, 111 S.Ct. 2631; other times, not. Id. at 881-82, 111 S.Ct. 2631. The majority merely and correctly applies Freytag’s test to answer that question as to the SEC’s five ALJs.
Relatedly, the dissent errs when it suggests that the majority is operating without “much precedent.” Dissent at 1201. The majority simply applies Freytag’s framework, as all lower courts must do. In truth, the dissent takes issue with and devotes much of its analysis to suggesting that the majority ought to follow the D.C. Circuit’s misapplication of Freytag wrought in Landry v. FDIC, 204 F.3d 1125 (D.C. Cir. 2000), and bolstered by Raymond J. Lucia Cos., Inc. v. Securities and Exchange Commission, 832 F.3d 277 (D.C. Cir. 2016). The critical difference between the majority and Landry and Lucia is that the majority recognizes that Freytag does not make final decision-making authority the sine qua non of inferior Officer status. 501 U.S. at 881-82, 111 S.Ct. 2631.
The D.C. Circuit erroneously suggested as much in Landry when it said, over Judge Randolph’s contrary view, that the Freytag Court saw final' decision-making authority as “exceptionally]” important and “critical” to determining Officer status. 204 F.3d at 1134. And Lucia compounded that error when it acknowledged that the parties identified (as here) other powers the SEC’s ALJs exercise but then narrowed its analysis to and rested its holding entirely on whether those ALJs can issue final decisions for the SEC. See 832 F.3d at 285 (acknowledging that “the parties principally,” not only, “disagree[d] about whether” the SEC’s “ALJs issue final decisions of the” SEC and explaining that the court’s “analysis begins, and ends,” with that question); id at 285-89 (analyzing only whether the SEC’s ALJs can render final decisions). The majority applies precedent: Freytag, not Landry or Lucia.
The dissent also contends that the majority’s opinion “will be used to strip all ALJs of their dual layer for-cause protection.” Dissent at 1200. This troubling statement calls for a response because the dissent essentially predetermines the holdings of hypothetical cases not before this court.
In some future case, a litigant may argue that all ALJs are inferior Officers. But as the majority here explains—and Frey-tag commands—whether a particular federal employee or class of employees are Officers subject to the Appointments Clause requires a position-by-position analysis of the authority Congress by law and a particular executive agency by rule and practice has delegated to its personnel. 501 U.S. at 881-82, 111 S.Ct. 2631. Some ALJs within particular agencies may exercise so little authority and also be subject to such complete oversight (e.g., unlike here, de novo review) that they are not Officers. The majority rightly does not attempt to answer whether each ALJ in every federal agency is an Officer because Freytag disclaims such sweeping pronouncements, id. and, in any event, it is not necessary to do so to resolve Mr. Bandimere’s appeal.
The dissent also does not stop after incorrectly stating that the majority has addressed an issue not before us. It in *1190 stead goes on to suggest that the majority’s non-answer to an unasked question may lead to the implosion of the federal civil service, at least as to all federal ALJs. But the dissent is wrong as to the outcome of such a hypothetical future case. And in suggesting that this outcome follows from the majority’s opinion, the dissent unnecessarily sounds alarms which demand rejoinder.
Specifically, the dissent worries that the consequence of the majority’s opinion is that all federal ALJs are inferior Officers, that all federal ALJs are thus afforded the double-for-good-cause-removal protection forbidden by Free Enterprise Fund v. PCAOB, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010), and that, as a result, all federal ALJs will lose their civil service protections. Warning of the dangers of such a conclusion, the dissent suggests that the Social Security Administration will be impaired when its 1,537 ALJs lose their civil service protections. But there are at least two errors in the dissent’s speculation about facts not before this court.
First, it may well be that within the Social Security Administration ALJs are removable in a manner that does not run afoul of Free Enterprise Fund. For example, if the person or persons responsible for firing those ALJs are not afforded good-cause removal protections, then the Administration’s ALJs will retain their civil service protections even if they are inferior Officers. The dissent cannot say for certain whether this is so, because we have no briefing on the subject in this case, which deals only with the SEC.
Second, even assuming that all federal ALJs are Officers who are removable only for good cause and that they are all selected by Officers who are also removable only for good cause, the dissent knocks down a straw man by suggesting that Free Enterprise Fund might require stripping all ALJs of their civil service protections. Rather, as Free Enterprise Fund reminds us; courts normally are required to afford the minimum relief necessary to' bring administrative overreach in line with the Constitution:
Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact. Because the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions, the normal rule is that partial, rather than facial, invalidation is the required course.... Concluding that the removal restrictions are invalid leaves [an Officer] removable .,. at will, and leaves the President separated from [the Officer] by only a single level of good-cause tenure.
Id. at 508-09, 130 S.Ct. 3138 (quotation marks, alterations, and citations omitted).
The D.C. Circuit just recently employed this principle in PHH Corp. v. Consumer, Financial Protection Bureau, 839 F.3d 1 (D.C. Cir. 2016). There, the court held, inter alia, that the Consumer Financial Protection Bureau (CFPB) was so structured as to violate Article II because it was headed by a single director who was removable only for good cause. Id. at 12-39. But the remedy for this unconstitutional structure was not—as the petitioners had urged—the abrogation of the CFPB. Id. at 37. Applying Free Enterprise Fund and other Supreme Court precedents, the D.C. Circuit instead struck the single offending clause from the CFPB’s implementing legislation and rendered the director removable by the President at will, rather than for good cause. Id. at 37-39.
Thus, contrary to'the dissent’s suggestions, the majority’s opinion portends no change to any ALJ’s robust protections.’ *1191 The dissent states that all 1,792 federal ALJs are removable only by the United States Merit Systems Protect Board (MSPB), “and only for good cause.” Dissent at 1200. Assuming arguendo that is always correct, see 5 U.S.C. § 7521, cursory research on this unbriefed issue reveals that the MSPB is composed of three members, each of whom are appointed directly by the President but removable only for good cause. 5 C.F.R. § 1200.2. So even if this court were faced with the hypothetical future case that troubles the dissent, there is no cause for alarm that the administrative state will be eroded (and of course, that is of no import to whether the government is following Article II). See Free Enterprise Fund, 561 U.S. at 499, 130 S.Ct, 3138. A court faced with such a challenge would be empowered only to order the minimal remedy effective to cure the Article II error, id. at 508-10, 130 S.Ct. 3138: rendering the MSPB’s three members removable by the President at will. While, the dissent opines on the hypothetical consequences of the majority’s opinion, today’s decision will have none of the consequences to the nationwide civil service that the dissent predicts.
Additionally, the dissent is incorrect when it argues that the majority is not showing appropriate “deference to Congress,” Dissent at 1201, on this structural constitutional question, as when it states: “Whether federal ALJs should receive such dual for-cause protections is perhaps a question that could be debated, but Congress has already decided this question in favor of protecting ALJs....” Id. at 1200 n.8. Freytag rejected this exact argument and recognized that “[t]he structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic.” 501 U.S. at 880, 111 S.Ct. 2631. With respect.to removal specifically, even if Congress sought to insulate all federal ALJs from Executive control by placing them behind double layers of good-cause removal protection, Free Enterprise Fund holds that a court would be obliged to afford that decision no deference and instead to strike the unsound architecture. 561 U.S. at 497, 130 S.Ct. 3138.
In any event, the dissent’s dire predictions about hypothetical consequences of the majority’s holding are exaggerated.
II
Turning to the dissent’s proposal for deciding this case on the facts here, the dissent appears to sub silentio urge this court to adopt Landry and Lucia’s misstatement of Freytag’s test for determining whether a federal' employee is an inferior Officer. That is, the dissent focuses almost exclusively on whether the SEC’s ALJs exercise final decisionmaking authority, calling it the “[m]ost important[ ]” consideration that “makes all the difference” in deciding whether the ALJs are Officers. Dissent at 1194 (citing, inter alia, Lucia, 832 F.3d at 285-87); see id. at 1196 n.2 (arguing that “[delegated sovereign authority has long been understood, to be a key characteristic of a federal ‘office’ ”); id. at 1197-98 (contending, absent citation to authority, that this question “is not about” the SEC’s delegation to its ALJs of “day-to-day discretion” because “the Appointments Clause does not care about that”).
But as the majority points out, this mode of analysis—and the D.C. Circuit’s repeated application of it—is wrong. Freytag instead compels courts, as the majority does here, to examine all of the “duties and functions”. a federal employee has been delegated and then to determine whether that person is exercising the authority of the United States (an Officer) or simply carrying out “ministerial” government tasks (an employee). 501 U.S. at 881-82, 111 S.Ct. 2631. Here, the distinction is exemplified by whether the government *1192 employee in question was engaged in the ministerial task of transcribing the record at Mr. Bandimere’s hearing or was the person who decided on behalf of the United States that his testimony there was not believable and in what respects, critical issues to determining whether he ought to incur civil penalties. See id.
Likewise, final decision-making authority is but one sovereign power, albeit an important one that is typically sufficient to render an employee an Officer. See, e.g., id. at 882, 111 S.Ct. 2631. Though final decision-making authority might be sufficient to make an employee an Officer, that does not mean such authority is necessary for an employee to be an Officer, contrary to the dissent’s suggestion and Lucia’s holding—by its refusal to consider any of the SEC’s ALJs’ other duties and functions. 832 F.3d at 286. Conducting the correct, nuanced analysis of the powers Congress by statute and the SEC by rule and practice have afforded its ALJs, the majority correctly reasons that the SEC’s ALJs exercise significant authority and are thus inferior Officers, subject to the Appointments Clause. The dissent therefore errs—as do Landry and Lucia—by applying a truncated version of Freytag’s legal framework.
Further, even as to its analysis of the SEC’s ALJs’ decision-making authority, the dissent mischaracterizes the factual record in a manner that it is imperative to correct. Specifically, the dissent states and then repeatedly relies on the fact that the SEC is not required to afford its ALJs any deference and that it conducts de novo review of their decisions to conclude that the ALJs do not “have the sovereign power to bind the Government and third parties.” Dissent at 1194. The dissent also calls this a “difference that makes all the difference” between the SEC’s ALJs and “the special trial judges at issue in” Frey-tag. Id.
The dissent additionally states that “even where special trial judges” in Frey-tag “could not enter binding decisions, their initial decisions had binding effect” because the Tax Court was “required to presume correct” their “factual findings, including findings of intent, and to defer to [a] special trial judge’s determinations of credibility.” Id. at 1194 (citations omitted). The dissent is undoubtedly correct that “[s]uch deference was a delegation of significant authority to the special trial judges.” Id. As the dissent goes on to explain, “[m]any cases before the Tax Court ... involve critical credibility assessments, rendering the appraisals of the special trial judge who presided at trial vital to the Tax Court’s ultimate determination. And ... findings of fact often conclusively decide tax litigation, as they did in” Freytag. Id. at 1194-96 (quotation marks, alteration, and citation omitted). The dissent is also correct that, “it cannot be reasonably disputed that findings of fact ‘may well be determinative of guilt or innocence.’ ” Id. (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1969)): Indeed, as Napue emphasized, assessing the “truthfulness and reliability of a given witness” during live testimony is one such critical factual determination. 360 U.S. at 269, 79 S.Ct. 1173.
The dissent rightly points out that if an agency deferred to its personnel on such critical issues, “the Appointments Clause would be offended.” Dissent at 1196 n.l. But the dissent then applies these statements in an attempt to distinguish the special trial judges imbued with that authority from the SEC’s ALJs: “The Securities and Exchange Commission, by contrast, is not required to give its ALJs any deference” and “may review its ALJs’ conclusions of law and findings of fact de novo.” Id. at 1197. At the same time, how *1193 ever, the dissent admits that the “SEC may sometimes defer to the credibility determinations of its ALJs.” Id. at 1197 n.3. And the dissent does not attempt to reconcile that concession with its earlier-stated admission that credibility assessments may be outcome determinative. Lucia relied in part on this same distinction. 832 F.3d at 286 (stating that the SEC conducts “de novo review” of its ALJs’ decisions); id. at 288 (stating that the SEC “reviews an ALJ’s decisions de novo,” but acknowledging that the SEC “may sometimes defer to the credibility determinations of. its ALJs,” and citing Landry, 204 F.3d at 1133, and the SEC’s own regulations and orders sanctioning this practice).
This characterization of the SEC’s actual process of reviewing its ALJs’ decisions is wrong, notwithstanding its attempt to characterize its review as “de novo.” David F. Bandimere, SEC Release No. 9972, 2015 WL 6575665, at *20 (Oct. 29, 2015). In footnotes 83 and 114 of its opinion in Mr. Bandimere’s case, the SEC reveals the full effect of affording its ALJs the very deference that the dissent explains runs afoul of the Appointments Clause. Id. at *15 n.83, *20 n.114. Specifically, the SEC determined that Mr. Bandimere’s “falsely telling [Mr.] Loebe that excess profits would go to a Christian charity rather than to pay him [was] evidence of [his] intent to deceive.” Id. at *15. In making that determination, the SEC explained that Mr. “Bandimere testified that he did not remember making this statement to [Mr.] Loebe, but the ALJ found [Mr.] Loebe’s testimony more credible than [Mr.] Bandimere’s as to this issue.” Id. at *15 n.83. Then, instead of rendering its own credibility determination with respect to the conflicting testimony, the SEC applied its rule that “[a]n ALJ’s credibility findings are entitled to considerable weight.” Id. (citations omitted). The SEC thus engages in deferential, not de novo review of key aspects of its ALJs’ decisions.
The SEC admitted as much when it addressed Mr. Bandimere’s Appointments Clause challenge. It professed to review its “ALJs’ decisions de novo.” Id. at *20. The dissent simply takes the SEC at its word. Yet the SEC added the following caveat to that statement: “We do not view the fact that we accord Commission ALJs deference in the context of demeanor-based credibility determinations to afford our ALJs with the type of authority that would qualify them as inferior officers.” Id. at *20 n.114. The SEC attempted to shore up its conclusion on this Article II question with the disclaimer that it “will disregard explicit determinations of credibility when [its] de novo review of the record as a whole convinces [it] that a witness’s testimony is credible (or not) or that the weight of the evidence warrants a different finding as to the ultimate facts at issue.” Id. (quotation marks and citations omitted).
But that proviso is cold comfort to a defendant, like Mr. Bandimere, whose liability for massive civil penalties depends in no small part on the United States’s assessment of his credibility during live testimony, credibility determined by the only government employee designated to preside over that testimony—an ALJ. And whatever the SEC means by its disclaimer, it does not equate to de novo review. Rather, whether the SEC disagrees with its ALJs’ credibility determinations triggers its own rule that an ALJ’s evaluation of a witness’s live testimony is entitled to “considerable weight.” Id. at *15 n.83. Thus, at minimum, the SEC’s ALJs exercise significant discretion over issues of credibility, unchecked by faux “de novo” review.
As the dissent concedes, affording bureaucrats such deference permits them to exercise the sovereign authority of the United States in an often-outcome-determinative fashion that is incompatible with *1194 the Appointments Clause. Therefore, even under the dissent’s (and Lucia’s) truncated Freytag analysis, the majority correctly holds that the SEC’s ALJs are inferior Officers.